STATE ex rel. KORNMANN, Plaintiff, v. LARSON, Defendant

(138 N.W.2d 1)

(File No. 10267. Opinion filed November 19, 1965)

**Vincent J. Protsch,** Howard, **Charles Kornmann,** Aberdeen, for plaintiff.

**Frank L. Farrar,** Atty. Gen., Pierre, for defendant.

ROBERTS, P. J. Charles Kornmann, as relator, filed his petition in this court asking a writ of mandamus to require Alma Larson, as Secretary of State, to accept and file a petition for the referendum of Chapter 296, Laws 1965. Relator claims that the imposition under this statute of an excise tax upon certain services and professions is not necessary for the support of the state government and its existing institutions within the meaning of the constitution excepting certain legislative enactments from the power of referral and is therefore subject to the referendum.

Section 1 of the act under consideration imposes "a tax at the same rate as that imposed upon sales of tangible personal property in this state upon the gross receipts of any person from the engaging or continuing in the practice of any profession or of any business in which the service rendered is of a professional, technical or scientific nature and is paid for on a fee basis, or

544

by a consideration in the nature of a retainer". Section 2 imposes a tax at the same rate "upon the gross receipts of any person from engaging or continuing in any of the following businesses or services in this state: Abstractors; accountants; architects; barbers; beauty shops; blacksmith shops; car washing; dry cleaning; dyeing; exterminators; garage and service stations; garment alteration, cleaning and pressing; janitorial services; laundry and laundromats; linen and towel supply; photography; photo developing and enlarging; tire recapping; welding and all repair services."

The amendment to Section 1, Article III, of the State Constitution in 1898 reserving to the people the power of referendum excepts therefrom "* * * such laws as may be **necessary** for the **immediate** preservation of the public peace, health or safety, support of the state government and its existing public institutions." Section 22 of the same article relating to emergency acts becoming effective upon passage and approval is not applicable unless an act is within the classes of laws excepted from the referendum. State ex rel. Richards v. Whisman, 36 S. D. 260, 154 N.W. 707, L.R.A.1917B, 1, writ of error dismissed, 241 U.S. 643, 36 S.Ct. 449, 60 L.Ed. 1218.

 The word "immediate" qualifies only the words "preservation of the public peace, health or safety." It then follows as pointed out in Hodges v. Snyder, 43 S.D. 166, 178 N.W. 575, that the "exception found in section 1 of article 3, names two classes of laws that are not subject to the referendum: First, such laws as are declared by the act itself to be **necessary** for the **immediate** preservation of the public peace, health, or safety of the state; and, second, such laws as are **necessary** for the support of the government and its existing public institutions. A law may be necessary for the preservation of the public peace, health, or safety, and still be subject to the referendum, unless the Legislature declares it necessary for the immediate preservation of the public peace, health, or safety. * * * But a law that is necessary for the support of the state government or its existing institutions is not subject to the referendum in any event."

 In its decisions, this court has held that a legislative declaration of an emergency is a nullity where the act could

not by any fair inference be said to be in the exercise of the police power nor in support of the state government and its existing institutions. State ex rel. Loe v. Davis, 41 S.D. 327, 170 N.W. 519; Warwick v. Bliss, 45 S.D. 388, 187 N.W. 715; State ex rel. Kleppe v. Steensland, 46 S.D. 342, 192 N.W. 749; Johnson v. Jones, 48 S.D. 260, 204 N.W. 15; State ex rel. Driscoll v. Smith, 49 S.D. 106, 206 N.W. 233; Engelcke v. Farmers' State Bank of Canistota, 61 S.D. 92, 246 N.W. 288; State ex rel. Parker v. Youngquist, 69 S.D. 423, 11 N.W.2d 84; In re Opinion of the Judges, 58 S.D. 72, 234 N.W. 671. Chapter 296, Laws 1965, is a tax measure and the additional revenue from the tax goes into the general fund of the state. It is obviously a law for the support of the state government. The question then is whether this law is necessary for that purpose. As this court said in State ex rel. Wegner v. Pyle, 55 S.D. 269, 226 N.W. 280, the effect of the provisions excepting from the referendum laws "necessary for the support of the state government and its existing public institutions" is not to except from the referendum all laws for such support, but only those as are necessary for that support. This court in determining whether a law is necessary for the support of the state government and its existing institutions will consider the effect upon such support of delay incident to referral and the consequences if the law is defeated. If the efficient operation of the state government would be unaffected by the delay or possible defeat, the law in such instance cannot be said to be necessary so as to prevent a referral.

While this court must give to the action of the legislature every favorable presumption, the mere fact that a statute is for the support of the state government will not preclude judicial review of the question whether the act is "necessary" for such support. This court, however, will not enter upon an ascertainment of facts through formal proof by sworn witnesses and authenticated documents to determine necessity of a statute for the support of the state government. The scope of the review is limited to what appears upon the face of the act and facts within the court's judicial knowledge. State ex rel. Shade v. Coyne, 58 S.D. 493, 237 N.W. 733; State ex rel. Botkin v. Morrison, 61 S.D. 344, 249 N.W. 563; City of Pierre v. Siewert, 63 S.D. 485, 261 N.W. 42; see also annotation in 100 A.L.R.2d 304.

The Constitution of the State of Washington, like ours, excepts from referendum provisions "such laws as may be necessary for the immediate preservation of the public peace, health or safety, support of the state government and its existing public institutions." It is the settled rule in that state that in determining the necessity for an enactment for the support of the state government the court as stated in State ex rel. Pennock v. Reeves, 27 Wash.2d 739, 179 P.2d 961, "will enter upon no inquiry as to the facts, but must consider the question from what appears upon the face of the act, aided by the court's judicial knowledge". In State ex rel. Hoppe v. Meyers, 58 Wash.2d 320, 363 P.2d 121, 100 A.L.R.2d 304, a mandamus proceeding to compel submission of a portion of an act increasing a motor fuel and use fuel tax to referendum the court adhering to prior holdings stated:

> "It is therefore clear that the law, a portion of which the relator desires to have submitted to referendum, is a law directed to the support of an existing institution of the state government. But, as we have already noted, the relator contends that the law is not necessary, because it does not direct nor require a refunding of the outstanding bonds. Our inquiry into this question must be limited to an examination of the act and to matters of which we can take judicial notice, bearing in mind that it must be presumed that facts existed which justified the legislative determination that the law was necessary."

It was held in State ex rel. Wegner v. Pyle, supra, that a statute levying a registry tax on automobiles and providing that the levy against real and personal property be reduced in proportion to the amount of taxes collected under the act would not increase the revenue already provided for in existing statutes and was therefore subject to the referendum. In State ex rel. Botkin v. Morrison, supra, wherein the statutes involved also contained a replacement provision, we disapproved of the declaration in the Pyle case to the effect that such provision in a revenue measure establishes the fact that the act merely provides for a shift of the tax burden and that the support of the state govern-

ment is unaffected. This court observed that it must be presumed that the legislature availed itself of the opportunity to determine the facts and that necessity may not have consisted in securing additional revenue, but in maintaining existing amounts and because of the then economic situation preventing a shriveling of present sources of revenue.

A statute requiring the transfer of ten percent of the gross receipts of eighteen boards and commissions to the state's general fund was held in State ex rel. Parker v. Youngquist, supra, not to be excepted from the referendum because it neither levied nor increased any tax and appropriated no money, but from what appeared upon the face of the statute merely effected a diversion of taxes from special purposes to the general fund, not from necessity, but because it was equitable to do so. Insofar as the holding in that case is concerned it does not sustain contention of relator. In the present case the statute levies an additional tax and does not merely provide for an equitable diversion of revenue.

Judicial notice is the taking cognizance by courts of those facts "capable of immediate and accurate demonstration by resort to easily accessible sources of indisputable accuracy." McCormick, Evidence, § 325. "Most matters which the court may notice fall into one of two classes, those which come to the knowledge of men generally in the course of the ordinary experience of life, and are therefore in the mind of the trier, or those which are generally accepted by mankind as true and are capable of ready demonstration by means commonly recognized as authoritative." 31 C.J.S. Evidence § 7. The doctrine does not require actual present knowledge on the part of the court. It may make investigation of "sources of indisputed accuracy" to ascertain facts of which judicial notice may be taken. Judicial notice may be taken of public or official records of general public interest such as bills introduced in the legislature and legislative journals. Elfring v. Paterson, 66 S.D. 458, 285 N.W. 443; Barnsdall Refining Corporation v. Welsh, 64 S.D. 647, 269 N.W. 853. In the case last cited legislative journals were noticed in determining whether a statute was passed in accordance with constitutional requirements. A statute is ordinarily tested as to

its validity by its language in the light of those matters of which the court takes judicial notice. In Home Owners' Loan Corp. v. Oleson, 68 S.D. 435, 3 N.W.2d 880, this court took judicial notice that a temporary economic condition which furnished occasion for exercise of power to enact a mortgage moratorium statute had ceased to exist in this state. This court therein noticed the existence and contents of reports of the South Dakota Department of Agriculture and of the Superintendent of Banks.

▮ In holding a certain matter not the subject of judicial notice, this court in Soyland v. Farmers Mut. Fire Ins. Co., 71 S.D. 522, 26 N.W.2d 696, 173 A.L.R. 1202, stated that it is not permissible for the court to take judicial notice of a fact that may be disputed by competent evidence. But there is a conflict of opinion as to whether judicial notice is limited to facts that are certain and indisputable. See Annotations in 45 A.L.R.2d 1169. Professor McCormick advocates a broad concept of judicial notice for legislative facts as distinguished from adjudicative facts. McCormick, Evidence, § 329. In order that this court may be justified in declaring that the act in question is not necessary for the support of the state government and its existing institutions and therefore subject to referendum it must at least appear from facts of which we may judicially notice that the conclusion is not reasonably disputable. In Ritholz v. Johnson, 244 Wis. 494, 12 N.W.2d 738, the court said: "When it appears from the information at hand that the facts are such as to render the conclusion to be drawn therefrom fairly debatable, the matter is for the determination of the Legislature and the court may not set up its judgment against a legislative determination."

Before proceeding further, we will consider and determine the scope of our inquiry. As we have indicated, we are concerned with the action of the legislature. We must give to the legislative determination that the law in question is necessary every favorable presumption. As ordinarily considered the existence of a rational basis for a legislative judgment of necessity is dependent upon facts within the sphere of judicial notice at the time of enactment. There is here involved a consideration of the relevancy of certain information brought to the attention of the court after hearing and submission.

Section 22, Article III, State Constitution, provides:

"No act shall take effect until ninety days after the adjournment of the session at which it passed, unless in case of emergency, to be expressed in the preamble or body of the act, the legislature shall by a vote of two-thirds of all the members elected of each house, otherwise direct."

██ ██ This section and Section 1 of the same article expressly reserving to the people "the right to require that any laws which the legislature may have enacted shall be submitted to a vote of the electors of the state before going into effect" excepting laws which are necessary for the immediate preservation of the public peace, health, or safety or which are necessary for the support of the state government and its existing institutions are to be construed together "as if forming different parts of but one section." State ex rel. Lavin v. Bacon, 14 S.D. 394, 85 N.W. 605; State ex rel. Richards v. Whisman, supra. This court has held that an act passed at a regular session that is necessary for the support of the state government and its existing institutions and therefore not subject to the referendum goes into effect on the first day of July after its passage in accordance with the provisions of SDC 55.0607 unless the legislature declares the existence of an emergency under Section 22, above quoted, in which event the act goes into immediate effect or at such time as the legislature may fix. Hodges v. Snyder, supra. If Chapter 296, Laws 1965, is within the excepted class of laws which are necessary for the support of the state government it became effective on the first day of last July and its operation could not be suspended nor postponed by filing of the referendum petition. Whether the act became effective and not subject to referendum depends upon the state of facts existing on that date and subsequent to its enactment. It would be incongruous to hold that facts existing on July first have ceased to exist and subsequent events and circumstances, as for example, that no state levy as evidenced by proceedings of the State Board of Equalization in August of this year is required or that the need of state revenues has been lessened because certain appropriations have been declared invalid for the rea-

son that they were unconstitutionally included in the General Appropriation Act (State ex rel. Oster v. Jorgenson, 81 S.D. 447, 136 N.W.2d 870), now show that the act in question is not necessary for the support of the state government.

This conclusion makes it unnecessary for us to consider whether the parties should be given an opportunity to supplement or rebut the information brought to the attention of the court since submission.[1] The proceedings of the State Board of Equalization in August, 1965, and other information obtained by independent investigation are not within the scope of our inquiry and have no bearing on the merits.

▮▮ It is well known that the legislature was confronted with mounting need of additional revenues for the 1965-1967 biennium to finance rising expenditures and increased state aid to local governments. Additional educational costs are predominant in the upward trend in present and projected expenditures. The budget report submitted to the legislature stressed the need of maintaining or increasing the quality of education and emphasized increased enrollments in state universities and colleges and increased needs both as to faculties and facilities. Recommended amounts to finance governmental functions in other areas were also higher than in the preceding fiscal period. Revenue measures including the broadening of the sales tax base were enacted to meet the additional appropriation requirements. The wisdom of the means is not ours to review.

▮ Counsel set forth in their briefs data and information contained in the records of the State Auditor. They are records of which this court may take judicial notice. It appears that the general fund appropriations for the current biennium, including continuing appropriations, amount to $109 million. The unobligated general fund balance on June 30, 1965 was approx-

---

1. See Appraisal of Techniques for Presenting Social and Economic Facts to Courts, 61 Harv.L.Rev. 692; Appellate Courts Use of Facts Outside of the Record by Resort to Judicial Notice and Independent Investigation, 1960 Wis.L.Rev. 39; American Law Institute, Model Code of Evidence, Rule 804(1) providing: "The judge shall inform the parties of the tenor of any matter to be judicially noticed by him and afford each of them reasonable opportunity to present to him information relevant to the propriety of taking such judicial notice or to the tenor of the matter to be noticed."

imately $8.7 million. The balance in 1964 was $8 million and in 1963 $6.8 million. Relator asserts that the general fund surplus has reached an unreasonably high level. He estimates that no revenue from the broadened sales tax is needed to maintain a substantial general fund balance during the current biennium and that since such revenue is not required for the support of the state government, the electorate has a constitutional right to approve or reject the act here under consideration at the polls.

We have consistently held that a law providing for the support of the state government and its existing institutions is not subject to referendum even if the legislature makes no declaration of emergency. The expediency or wisdom of an enactment is legislative and not justiciable. We reiterate that this court must presume that facts existed which justified the legislative determination that the act in question was necessary. Unless we can say that the act is, in fact, not necessary for such support relator is not entitled to the writ prayed for. We may too accept relator's theory that a general fund surplus may be so "unreasonably and unnecessarily high" as to sustain a conclusion that additional revenues are not necessary.

The estimates and computations upon which relator relies with reference to state financing and the general fund surplus throughout the present biennium are highly uncertain and without the restricted doctrine of judicial notice. We too are not prepared to say that the general fund surplus when compared to projected expenditures during the present biennium is unreasonably large. The legislative judgment is thus drawn in question and hence this court will not weigh its judgment against that of the legislature when the matter is at least debatable and not without support in reason.

Writ denied.

RENTTO and HOMEYER, JJ., concur.

HANSON, J., concurs in result.

BIEGELMEIER, J., dissents.

BIEGELMEIER, Judge (dissenting).

In State ex rel. Wegner v. Pyle, 55 S.D. 269, 226 N.W. 280, the court held the reservation in Art. III, § 1, of the Constitution that

"the people expressly reserve to themselves the right * * * to require that any laws which the legislature may have enacted shall be submitted to a vote of the electors * * * before going into effect * * *"

was not to be strictly construed. It wrote:

"This language is plain, and leaves no room for construction either strict or liberal * * *".

Then, after quoting the clause which excepted from referendum

"'laws * * * necessary for the * * * support of the state government * * *'"

the court continued:

"* * * if any part * * * is to be strictly construed, it is this exception."

The courts in effect are unanimous in support of the rule by saying the referendum provision should be given liberal construction.[1] Our state legislature has declared this same policy in construing petitions. SDC 55.0406.

Courts have uniformly said the power of initiative and referendum is the exercise of a power reserved to the people and not the exercise of a right granted to them. Palmer v. Broadbent, 123 Utah 580, 260 P.2d 581. No technical inhibitions or prohibitions should be set up by administrators to whom such requests are by law submitted. State ex rel. Benham v. Cheever, 71 Wyo. 303, 257 P.2d 337.

Our decisions recognize the referendum as part of the legislative process. State ex rel. Wegner v. Pyle, 55 S. D. 269, 276, 226 N.W. 280, 283. Of that and the use of the word "necessary" the court wrote:

---

1. Albuquerque Bus Co. v. Everly, 53 N.M. 460, 211 P.2d 127; State ex rel. Carson v. Kozer, 108 Or. 550, 217 P. 827; Wood v. Byrne, 60 N.D. 1, 232 N.W. 303; Ford v. Mitchell, 103 Mont. 99, 61 P.2d 815; Laam v. McLaren, 28 Cal.App. 632, 153 P. 985; State ex rel. Howell v. Superior Court, 97 Wash. 569, 166 P. 1126; Brownlow v. Wunsch, 103 Colo. 120, 83 P.2d 775; Coleman v. Sherrill, 189 Ark. 843, 75 S.W.2d 248.

"As between the **two law-making powers,** we must give
to the word 'necessary' some meaning. In doing so we
do not presume to say the law is not necessary legis-
lation, since the Legislature in its wisdom has seen fit
to enact it. We say that the legislative determination,
even though binding on all departments of government,
including this court, is **not** binding on the paramount
**legislative power vested in the people,** and that they may
ratify or repudiate it as they see fit.

"This court \* \* \* must certainly \* \* \* de-
termine the powers of each (the people and the legisla-
ture) in the **field of legislation.** There can be no power
in the Legislature to conclude by its action a reserved
right belonging to the people. To so hold would be to
sanction a usurpation of power and make the Legisla-
ture supreme. \* \* \*

"Conceding that it is \* \* \* a law for the support
of the state government \* \* \* we must decide if
it is **necessary** for such support \* \* \*". (Emphasis
supplied.)

Originally by Art. III, § 6 and § 7, the legislature met in
regular session once every two years. These sections were
amended in 1962 to provide for sessions in January of every
year. Thus, while the legislature may provide for appropriations
over a biennium, it may at any of these sessions change both
appropriations and tax measures, so annual fiscal computations
are now properly considered to determine whether the law is
necessary for support of the state government. See Art. XI, § 1,
of the Constitution which declares, "The legislature shall pro-
vide for an annual tax, sufficient to defray the estimated ordin-
ary expenses of the state for each year \* \* \*". However,
annual and biennial figures are both here shown.

Bearing the above rules in mind and that the constitutional
provision reserves to the people the power of referendum of all
laws except such "as may be necessary for the \* \* \* sup-
port of the state government \* \* \*" (which excepting clause
is to be strictly construed) the facts either stipulated to or from

official records in the offices of state and constitutional officers are now set out.

Appropriations for the two year period from July 1, 1965, to June 30, 1967, were $109,011,197. Deducting $6,048,500 heretofore held unconstitutionally included in the General Appropriation Bill (State ex rel. Oster v. Jorgenson, 81 S.D. 447, 136 N.W.2d 870) leaves $102,962,697 for the biennium or $51,481,349 for each fiscal year. It is stipulated this included all continuing appropriations. The State Auditor's record shows an unobligated balance in the general fund on June 30, 1965 of $8,713,772.[2] This is the **net** amount over all outstanding warrants and claims, including appropriations made but not yet actually expended.

Under Art. XI, § 1, supra, the annual tax may not exceed two mills on the dollar for ordinary expenses of the state, interest, etc. set out therein. The constitutional authority to levy this tax, formerly with the Tax Commission, is now vested with the State Board of Equalization. That Board is required to determine the rate of state tax to be levied for the purposes stated, including "payment of all appropriations made by the Legislature". SDC 57.0501. To perform the constitutional and statutory duty, the Board is required to determine the amount in dollars necessary to be raised and "shall require the State Treasurer to certify * * * the amounts available in the general fund of the state and the probable amounts to become available during the year, from whatever source other than the general property tax." The Board then deducts from the amount necessary to be raised, the amounts certified by the State Treasurer and as ascertained by the Board as being available and

"shall then levy a tax against the taxable property in the state sufficient only to provide the revenues **necessary** to **equal** the balance of the sum ascertained to be **necessary** to meet the requirements * * *". (Emphasis supplied.) SDC 57.0501.

On August 2, 1965, the Board met to perform its duties. The State Treasurer certified to the Board in writing the amounts and fig-

2. The State Treasurer's balance in the general fund June 30, 1965 was $12,729,549.

ures required by law, which were recorded in its records. For the fiscal year ending June 30, 1966, they show transfers of $3,-836,424 and receipts of $48,893,870, or $52,730,294, which with the net general fund balance above set out totals $61,444,066. Deducting the $51,481,349 appropriations from that total leaves a surplus of $9,962,717. For the biennium on the same basis, the surplus is $9,797,481.

This report of the State Treasurer made to another State Board in its official capacity in the performance of duties required by law, declares that without considering any receipt from the law sought to be referred and after paying out all funds appropriated for the fiscal year a net surplus will exist in a sum greater than that existing June 30, 1965. This compels the conclusion the efficient operation of state government will be unaffected by the delay or possible defeat of the law, and cannot be said to be necessary so as to prevent a referral within the words of the majority opinion which correctly states the holding in State ex rel. Wegner v. Pyle, supra. This case is that simple.

But that is not all. The official records of the meeting of the State Board of Equalization show the State Treasurer was called in to analyze his report and he correctly stated if the act broadening the 3% sales tax to include services (which was then subject to attack as unconstitutional) were invalidated by the Supreme Court, the state government could continue to function. The State Budget Director appeared and discussed the financial report and concurred in the Treasurer's opinion that no state tax levy was necessary. Thereafter in official action, the Board unanimously determined "NO STATE LEVY IS REQUIRED". That determination made by the Board is conclusive that Chapter 296 which levies a 3% tax on certain "services and professions" not theretofore taxed was, and is, not necessary for the support of the state government. That action made within its official authority and under mandatory requirement of law is binding on the court and supports the undeniable fact that without this tax, the support of state government will be unaffected. If so, as stated, the act is referable. State ex rel. Wegner v. Pyle, 55 S.D. 269, 280, 226 N.W. 280, 284, hereafter quoted. While those official records and acts are conclusive, every

other record supports and fortifies the Board's decision and the similar conclusion the act is not necessary.

The majority describes it as incongruous to hold that events subsequent to July 1, 1965 affect the facts then in existence as to necessity and cites as such events the proceedings of the State Board of Equalization of a month later and this court's decision deleting about six million dollars from the appropriations as unconstitutional. This is a non sequitur as the facts and assumptions stated were in existence on July 1, 1965.

As to the unconstitutional appropriations it is universally held:

"that an unconstitutional statute, though having the form and name of law, is in reality no law, but is wholly void, and ineffective for any purpose; since unconstitutionality dates from the time of its **enactment,** and **not** merely **from the date of the decision so branding it,** an unconstitutional law, in legal contemplation, is as inoperative as if it had never been passed." (Emphasis supplied.) 16 Am.Jur.2d, Constitutional Law, § 177.

This text voices the words of Anderson v. Lehmkuhl, 119 Neb. 451, 229 N.W. 773, and State ex rel. Miller v. O'Malley, 342 Mo. 641, 117 S.W.2d 319, to name but two of the host of cases cited in support thereof, without a holding to the contrary. The text also states, "no courts are bound to enforce" such a statute, and thus, the constitutional appropriations only had legal existence on July 1, 1965. All persons are presumed to know the law. 16 Am.Jur.2d, Constitutional Law, § 178. The legislature was charged with that knowledge when it passed the bill and this court when it was challenged by the referendum attempt before July 1, 1965.

With reference to the Board's proceedings, it considered the financial situation of the state as of July 1, 1965, based on the State Treasurer's Report as of that date. So both the majority's requirements were present, only the constitutional appropriations existed and the financial situation of the state reported as of July 1, 1965, were then, and now are, matters of record. Only

additionally, the Board, delegated as an arm of the legislature, was performing an act which was a continuance of legislative power. To say its decision made 30 days later is to be given no credence, is a tenuous thread of support. While the court contends it does not desire to weigh its judgment against that of the legislature, it is in effect entering that field and over-ruling or setting aside a decision of the legislative department.

Returning now to the Constitution, Art. III, § 1, reserves the right to the people to refer any laws except such as may be necessary for the support of the state government. What are such laws and what is the test to be applied? The majority opinion states the rule, but here is quoted the answer as written by this court:

"The true test in determining whether or not a law is necessary for the support of the state government is, What will be the effect upon the state government if the law is suspended until a vote can be taken, or what will be the effect if it is finally defeated? In the instant case, it is plain that the support of the government will be unaffected in any manner." State ex rel. Wegner v. Pyle, 55 S.D. 269, 280, 226 N.W. 280, 284.

That is the case at bar. A State Board of Equalization having been delegated by the legislature the constitutional authority and mandatory duty to levy a general property tax to meet the "requirements of the state" duly declared no further money or levy was necessary as of July 1, 1965. At that meeting the State Treasurer stated, as these figures show without dispute, that if the act here in issue—were to be declared invalid by the Supreme Court "the state government could continue to function". The State Budget Director concurred with the opinion of the State Treasurer that "no state levy is required". Such is the record of that Board.

Attention is called to the fact that when the Board met on August 2, 1965, state appropriations (upon which it based the decision not to make a state levy) appeared on its face to be over six million greater than at present for, on September 21,

1965, this court in the Oster decision, supra, deleted that amount from the appropriations.

To pursue the subject further, a comparison of the last two years shows the estimated receipts were on the conservative side. The Board's records show the following:

ESTIMATED RECEIPTS

| Fiscal Year | For the Next Year | Actual Receipts |
|---|---|---|
| 1964 | $33,219,305 | $33,576,121 |
| 1965 | 32,511,265 | 34,202,897 |

An examination of the Treasurer's report[3] confirms this safe and conservative judgment by checking the estimate of the retail sales tax item. The August 1964 estimate of 17½ million dollars for fiscal 1965 resulted in actual collections of over 18 million at the 2% rate. The 1965 estimate for fiscal 1966 at the 3% rate was raised at that rate, not on the actual 1965 receipts, but rather on the lower 1965 estimate. Other items appear to have been overlooked or omitted. The use tax actual collection of $187,140 for fiscal 1965 at the 2% rate, was estimated to be less for fiscal 1966:—$185,000—when the new tax rate in this item was also raised to 3%. 1965 Session Laws, Ch. 288. This should bring in an additional $90,000. The cigarette tax actual collection was $4,022,725 for fiscal 1965 at the 6¢ rate; by Ch. 293 of the 1965 Session Laws the rate was raised 2¢ to 8¢ per package; again the revenue for the 1966 fiscal year at the higher rate was estimated in a lower amount:—$4,000,000. In his message to the legislature, Governor Boe referred to retiring Governor Gubbrud's proposed two cent increase of the cigarette tax as obtaining 1½ million additional revenue annually.

The Governor's message was an official act required of him by the Constitution, Art. IV, § 4, and ought not be discarded but should be given consideration where, as here, it coincides with other official duties and records.

---

3. These are all recorded in the permanent books as part of the Board's official records and itemized in detail as to income, etc. which "shall at all times be open to public inspection". SDC 1960 Supp. 57.0420.

It is not reasonable to conclude the legislature would raise the use tax rate from 2% to 3% and the cigarette tax from 6¢ to 8¢ and collect less revenue than at the lower rate. Nor did the Treasurer or Board conclude that as to the raise in the sales tax. Consistent with the raise in the estimate of the sales tax collection is the added revenue from the use tax in the same proportion and that of the added revenue from the cigarette tax. Giving reasonable effect to these two legislative acts adds $1,300,000 each year to this surplus. The $9,962,717 annual surplus on June 30, 1966, thus becomes $11,262,717 and the 1967 surplus of $9,797,481 for the biennium becomes $12,397,481. It must be remembered none of these amounts includes any revenue from the act sought to be referred.

The debt limit of $100,000 in Art. XIII, § 2, of the Constitution does not "constructively require" South Dakota to maintain a surplus as defendant urges. Neither the Constitution nor our statutes mentions or authorizes a surplus or any term synonymous or similar to it. Contrawise the Constitution reserves the referendum to those acts or tax measures not "necessary". SDC 57.0501 gives the State Board of Equalization the authority and requires it to levy a tax at a limited rate,

> "which will produce a revenue sufficient to defray the estimated expense of the current year * * *"

and after considering the financial situation, it

> "shall then levy a tax against the taxable property in the state sufficient **only** to provide the revenues **necessary** to **equal** the balance of the sum ascertained to be **necessary** to meet the requirements of the state * * *". (Emphasis supplied.)

That an incidental surplus may remain or is desirable in the sum of $4,000,000 which Governor Gubbrud stated was needed "to protect us against a drop in revenues" and Governor Boe stated was "economically sufficient", may be of some interest. 1965 Senate Journal, pages 24 and 27. These comments may be justified by and founded on a philosophy indicated in laws passed by the legislature permitting levies by local governments of annual expenses, plus 5% as a reserve.

See e. g., SDC 1960 Supp. 57.0505; this authority does not apply to the constitutional problem at issue.

We should take judicial notice of these communications as they are a matter of common knowledge; in any event we should know and take judicial notice of the official record of the legislature and the highest officers of our state in the performance of their constitutional duties.[4] Supporting their assurances is the fact this surplus was only 3½ million in 1962, a stipulated fact the majority does not mention. Admittedly there will be a surplus greater than that without the revenue from the act sought to be referred and of such a size as to remove any question of its necessity.

With commendable candor defendant's brief does not dispute a surplus will exist, differing only as to the amount thereof.[5] The figures are shown in Appendix "A" herewith. They are exact and shown on both an annual and biennial basis, to indicate the surpluses at the end of each fiscal year. As to that point, with the legislature now meeting annually, an annual fiscal year only should be considered. That is because each session has the power to reduce, repeal or pass additional appropriations and revert unobligated balances to the general fund and may also pass new tax or revenue measures or reduce or

4. It is conceded the Governor's messages may be judicially noticed. In this opinion, the official reports and records are cited by chapter and verse in accord with the majority opinion. Petition of Oleson, 68 S.D. 435, 3 N.W.2d 880, and State ex rel. Cooperative Wool Growers v. Bushfield, 69 S.D. 172, 8 N.W.2d 1. Taking judicial notice of general conditions and such facts as the court did in those cases, it appears the surplus is to be of such an amount that many institutions, departments of government, organizations, associations, legislators and other interested citizens and public officials are engaged in public discussion and making plans in the coming session to dispose of and participate in it. That we can be oblivious of this general knowledge and yet conclude the law necessary for present governmental operation is difficult for me to understand.

5. Nor does the majority. Here it may be well to compare two of our constitutional provisions. Both of them lay down fundamental fiscal policies to prevent unlimited spending and resulting taxes by the legislature. Art. XIII, § 2, of the Constitution places a constitutional debt limit of $100,000; this prevents creation of a higher debt and thus higher taxes to pay the debt and interest, unless the people vote approval of it. By § 1 of Art. III the people reserve the right to vote approval or rejection of a law not necessary for the support of the government and thus prevent a higher tax than necessary or the build up of a state surplus from unnecessary taxes. This is but the philosophy and thinking of scholars of government and economics—private persons may need to build up reserves for the future, but a government need not do so as it has the power to tax for its needs and providing for surpluses merely encourages and provides a fertile field for spending by pressure groups. This is the very contingency the Constitution sought to guard against. See' Note 4.

repeal present tax laws. Discussion on any other basis is, therefore, inadmissible for it is pure speculation what the next session will or will not do as to one or several of the named alternatives. The only reasonable assumption is that in compliance with the State Constitution the 1966 Legislative Session will continue old, and create new tax laws, if necessary, to pay the funds then appropriated. Putting aside new appropriations or new tax laws the 1966 Session may pass, if any, it will be interesting to take note of the surpluses at the end of the fiscal years 1966 and 1967.

This year the court has held a legislative act levying this tax constitutional against an attack as to its title and meaning; it has in the main upheld a legislative general appropriation bill that departed from a custom of over a half century and approved such a bill to include nearly everything but new construction, acquisitions of property and aid to some government subdivisions. Both of these were contests between the power of the government and its citizens. Here it is a controversy between the smaller elected legislature and the "paramount" legislature—the voters—over a division of the latter's reserved power to legislate, a right which they share by the Constitution to approve the act should they so desire. In the Wegner referendum the people did not approve the act and defeated it 142,425 to 46,109. In our history the voters have approved two referred laws; one imposing a butter substitute tax and another an act regulating hospitals and maternity homes. Seventeen have been defeated, including money or tax bills, yet the state government survived.

I am unwilling to fetter or interfere with that constitutional right of the voters to perform their part of this reserved legislative power. As was aptly stated by the court in the Wegner opinion, supra:

"To so hold would be to sanction a usurpation of power and make the Legislature supreme. * * * If it is necessary, the voters can adopt it."

For the reasons given, I am compelled to dissent.[6]

### APPENDIX "A"

Three taxes were raised in 1965 other than challenged Ch. 296. They were the sales, use and cigarette taxes. Only the added 1¢ sales tax, used by the Board of Equalization is shown on the following chart taken from the stipulated facts, the Oster decision and exact amounts of record:

| ANNUAL BASIS | | RECORD |
|---|---|---|
| Unobligated Gen. Fund Balance | | $ 8,713,772 (1) |
| ½ Biennium receipts | | 52,730,294 (2) |
| | | 61,444,066 |
| From Appropriations | $109,011,197 | |
| Deduct unconstitutional items | | |
| (Oster decision) | 6,048,500 | |
| For 1 yr. divide by 2 | $102,962,697 (3) | 51,481,349 |
| SURPLUS 6-30-66 | | $ 9,962,717 |
| | | ===== |

\* \* \* \*

| BIENNIUM | |
|---|---|
| Unobligated Gen. Fund Balance | $ 8,713,772 (1) |
| Projected receipts | 104,046,406 (2) |
| | 112,760,178 (2) |
| 1965 Appropriations above | 102,962,697 |
| SURPLUS 6-30-67 | $ 9,797,481 |
| | ===== |

6. While in the practice, it was my thought to add a postscript to all correspondence as to where a citizen could place reliance for protection of his rights. As doubts of the stability of the executive and legislative branches to fill that sphere rose and fell, the courts remained the haven, anchor and bulwark. In view of the decisions in the two other cases referred to, approving expanded and heretofore unasserted legislative action and power and this present decision, it seems appropriate to revive and add that postscript here: "Who protects the public?"

(1) State Auditor's office.

(2) State Treasurer's Report to Board of Equalization, doubled for biennium, except for a non-recurring item of $1,414,182 included in fiscal 1966 only.

(3) Stipulated and undisputed.

---

The total receipts are the Board's official figures and, as stated in the opinion, are 1.3 million less than reasonably expected receipts. Current official incomplete reports confirm the receipts to be higher. They are not repeated as the surplus stated is not disputed.

Nor do the totals show any reversion or transfer of surplus from the State Cement Plant. Such transfers were made to the general fund in fiscal 1963, 1964 and 1965 in amounts of $4,414,-758.24, $2,900,000 and $2,500,000 respectively. The Governor's Budget for 1966 and 1967 listed transfers to be made of $2,400,000 for each year. The legislature made no transfer during the 1965 Session though the December 31, 1964 Auditor's Report showed a Cement Plant surplus of $14,081,326.85, including five million in cash accumulated in a reserve fund. See minutes of Legislative Research Council Subcommittee on Cement Plant Reserves October 18, 1965. No matter how you view it, these are funds belonging to the people of the state.