2001 SD 28

**Betty E. BRECK, Plaintiff and Appellant,**

v.

**Governor William J. JANKLOW and Members of the South Dakota State Legislature 75th Special Session, Defendants and Appellees,**

**and**

**South Dakota State Cement Plant Commission, d/b/a Dacotah Cement, Intervenor and Appellee.**

**No. 21832.**

Supreme Court of South Dakota.

Considered on Briefs on Feb. 28, 2001.

Decided March 6, 2001.

---

Betty E. Breck, Groton, SD, Pro se.

Roger W. Damgaard of Woods, Fuller, Shultz & Smith, Sioux Falls, SD, Attorneys for defendant and appellee Governor William J. Janklow.

Lawrence E. Long, Chief Deputy Attorney General and Jeffrey P. Hallem, Assistant Attorney General, Pierre, SD, Attorneys for defendants and appellees Members of the SD State Legislature 75th Special Session.

James S. Nelson of Gunderson, Palmer, Goodsell, attorneys for intervenor and appellee South Dakota State and Nelson, Cement Plant Commission, Rapid City, SD, d/b/a Dacotah Cement.

GILBERTSON, Justice.

[¶ 1.] Betty E. Breck appeals a judgment dismissing various claims challenging the sale of the South Dakota State Cement Plant. We affirm.

## FACTS

[¶ 2.] Since the early 1920s, the State of South Dakota has owned and operated its own cement plant in the Rapid City, South Dakota area. The State's ownership of a normally private commercial enterprise can be attributed to the lack of an in-state cement producer in the early–1900s and the monopolistic prices being charged for the product during the post-World War I era of heavy infrastructure development. *See Reeves, Inc. v. Stake,* 447 U.S. 429, 431, 100 S.Ct. 2271, 2275, 65 L.Ed.2d 244, 247, n. 1 (1980). In simple terms, because the cement[1] needs of the State and its citizens were not being met in an economic fashion by private enterprise, the State went into the business itself.[2]

[¶ 3.] The Cement Plant has functioned over the years with varying degrees of success. It has supplied the cement needs of the State and has also operated as a commercial venture for profit by selling cement to private customers both in and out-of-state. In the last several years, during the country's unprecedented economic expansion and a period of heavy construction, the Cement Plant has returned average profits to the State Treasury of $12,000,000 per year. However, despite these recent profits and consistent with modern business practices, the Governor and the Cement Plant's governing commission[3] and management have been involved in long-term strategic planning regarding the future operation of the Plant. Based upon this review, these enti-

---

1. " '[C]ement is a finely ground manufactured mineral product, usually gray in color. It is mixed with water and sand, gravel, crushed stone, or other aggregates to form concrete, the rock-like substance that is the most widely used construction material in the world.' " *Reeves,* 447 U.S. at 432, 100 S.Ct. at 2275, 65 L.Ed.2d at 248, n. 1 (quoting Portland Cement Association, the U.S. Cement Industry, An Economic Report 5 (2d ed.1978)).

2. Cement was not the only product the State sought to produce in these times. In 1918, amendments were made to the South Dakota Constitution that not only permitted State ownership of a cement plant, but also State electric power enterprises and State coal mines. *See* Historical Notes to SD ConstArt XIII, §§ 10, 11, 12, 13, 14 & 15.

3. The State Cement Plant is managed and controlled by a seven member commission appointed by the Governor. *See* SDCL 5–17–2, 5–17–2.3.

ties have concluded that changing market forces and the slowing economy as well as mounting concentration and competition in the cement industry pose significant threats to the continued viability and profitability of the Cement Plant.

[¶ 4.] In response to these threats and over the course of the last year, the Governor and Cement Plant Commission and management began exploring the possibility of selling the Cement Plant and investing the proceeds in a manner providing a stable revenue stream for State government. After an appraisal of assets, contacts with suitable purchasers and the submission of proposals from several potential buyers, a sales agreement in principle was concluded on December 23, 2000 with Grupos Cementos de Chihuahua/GCC Dacotah, Inc.(GCC).

[¶ 5.] The agreement for sale of the Cement Plant was made contingent on approval and ratification by the South Dakota Legislature by December 31, 2000. Thus, it was necessary for the Governor to call the Legislature into a special session that began on December 28, 2000. During the course of that two-day session, the Legislature passed a series of five bills and resolutions necessary to ratify various aspects of GCC's purchase agreement for the Cement Plant.

[¶ 6.] Prior to the special legislative session, the plaintiff here, Betty E. Breck, pro se, of Groton, South Dakota, brought an action for declaratory and injunctive relief against the Governor and Legislators of the special session. Breck sought a declaratory judgment that the sale of the Cement Plant was unconstitutional and illegal on various grounds and a restraining order preventing the consummation of the sale and its closing on February 28, 2001. Subsequently, the Cement Plant Commission was allowed to intervene in the action and a trial to the court was held on February 2. At the close of that trial, the trial court entered oral findings of fact, conclusions of law and an oral decision denying Breck all claims for relief. The trial

court's oral decision was subsequently incorporated by reference in its written findings of fact and conclusions of law and a written judgment was entered on February 9. Breck's appeal followed. The defendants then filed a motion for expedited appeal proceedings and an expedited briefing schedule which this Court granted and approved in an order entered February 15. Additional facts will be set forth as they become pertinent to the issues in this appeal.

## ISSUE ONE

[¶ 7.] **Is the sale of the Cement Plant prohibited by the South Dakota Constitution?**

 [¶ 8.] Preparatory to the Legislature's enactment of statutes initiating the State's operation of the Cement Plant in 1919, the South Dakota electorate approved a constitutional amendment in 1918 that authorized the State's entry into the cement business. The amendment is contained at SD ConstArt XIII, § 10 and provides:

> The manufacture, distribution and sale of cement and cement products are hereby declared to be works of *public necessity* and importance in which the state may engage, and suitable laws may be enacted by the Legislature to empower the state to acquire, by purchase or appropriation, all lands, easements, rights of way, tracks, structures, equipment, cars, motive power, implements, facilities, instrumentalities and material, incident or necessary to carry the provisions of this section into effect: provided, however, that no expenditure of money for the purposes enumerated in this section shall be made, except upon a vote of two-thirds of the members elect of each branch of the Legislature. (emphasis added).

Breck argues the word "necessity" in this provision prohibits the Legislature from enacting any laws to sell the Cement Plant. We disagree.

[¶ 9.] Absent any constitutional language prohibiting the Legislature from authorizing the sale of the Cement Plant, we hold that it was fully empowered to do so. First, it is settled that, unless prohibited by some constitutional provision, a state may dispose of its property just as any citizen may dispose of his property. *See Herr v. Rudolf,* 75 N.D. 91, 25 N.W.2d 916, 919 (N.D.1947). *Accord, Adkins v. Kalter,* 171 Ark. 1111, 287 S.W. 388, 389 (1926); *Peters v. Twogood,* 167 So. 206, 208 (La.Ct.App.1936); *State v. Hubbard,* 203 Minn. 111, 280 N.W. 9, 12 (1938). Second, as this Court has repeatedly held, our constitutional provisions are not grants of power to the Legislature, but are instead limitations on legislative authority and, therefore, legislative acts are presumed to be constitutional. *Poppen v. Walker,* 520 N.W.2d 238, 241 (S.D.1994). As was more fully explained in *Wyatt v. Kundert,* 375 N.W.2d 186, 190–191 (S.D.1985):

> The South Dakota Constitution, unlike the Constitution of the United States, does not constitute a grant of legislative power. Instead, our constitution is but a limitation upon the legislative power and the legislature may exercise that power in any manner not expressly or inferentially proscribed by the federal or state constitutions. Thus, except as limited by the state and federal constitutions, the legislative power of the state legislature is unlimited. "What the representatives of the people have not been forbidden to do by the organic law, that they may do." "Consequently, in determining whether an act is unconstitutional we search the state and federal constitutions for provisions which prohibit its enactment rather than for grants of such power." A presumption in favor of constitutionality is also accorded any legislative act and that presumption is not overcome until the act is clearly and unmistakably shown to be unconstitutional and no reasonable doubt exists that it violates constitutional principles. (citations omitted).

[¶ 10.] This Court cannot read the word "necessity" in Article XIII, § 10 in isolation and ignore its use within the phrase *"public* necessity." (emphasis added). This violates settled rules of constitutional construction. *See South Dakota Bd. of Regents v. Meierhenry,* 351 N.W.2d 450, 452 (S.D.1984) (constitutional provision must be read giving full effect to all of its parts); *Kneip v. Herseth,* 87 S.D. 642, 659, 214 N.W.2d 93, 102 (1974) (in construing constitutional provision, no wordage should be found surplus and no provision can be left without meaning). The phrase "public necessity" has a particularized meaning in the context of a declaration by a public entity. A "[p]ublic necessity is a substantial or obvious community need in light of attendant circumstances. It is a somewhat nebulous concept which requires more than mere convenience *but less than absolute or indispensable need." Dept. of Fin. Instit. v. Colonial Bank & Trust Co.,* 176 Ind.App. 368, 375 N.E.2d 285, 288 (Ind.Ct. App.1978) (emphasis added). *Accord Miller Transporters v. Public Serv. Com'n,* 518 So.2d 1018, 1019 (La.1988) (to be a "public necessity" a service does not have to be absolutely indispensable); *State Banking Bd. v. First State Bank,* 618 S.W.2d 905, 908 (Tex.Civ.App.1981)("public necessity" is a substantial or obvious community need in light of attendant circumstances as distinguished from a mere convenience on the one hand and an absolute or indispensable need on the other).[4] As is clear from this definition, nothing in Article XIII, § 10's use of the phrase "public necessity" should be construed to mandate the State's ongoing participation in the cement business as an absolute or indispensable necessity of indefinite duration. Article XIII, §§ 12 and 14 similarly

---

**4.** A determination that an acquisition by eminent domain is for a "public use" is distinguishable from a determination that an acquisition is a "public necessity." *See City of Des Moines v. Hemenway,* 73 Wash.2d 130, 437 P.2d 171, 176 (1968). This is not an eminent domain case and, therefore, precedents in that context are not considered here.

declare State participation in the power supply and coal mining business to be a "public necessity" and, yet, there is no State Power Plant or State Coal Mine. Given the constitution's identical declarations of "public necessity" as to all of these enterprises, all enacted at the same time, we find no more obligation imposed on the State to participate in the cement business than in the power supply or coal mining business.

[¶ 11.] Certainly the balance of Article XIII, § 10 is discretionary and permissive in terms of the State's participation in the cement business. The provision states that the State "*may* engage" in the business and that suitable laws permitting the State's participation "*may* be enacted by the Legislature." (emphasis added). This Court has repeatedly held that the word "may" should be construed in a permissive sense unless the context and subject matter indicate a different intention. *See State v. Burgers*, 1999 SD 140, ¶ 15, 602 N.W.2d 277, 281 (word "may" in a statute should be construed in a permissive sense). *See also In Re Request of Governor Janklow*, 2000 SD 106, ¶ 4, 615 N.W.2d 618, 620 (in interpreting constitutional sections, courts apply general principles of statutory construction). Nothing in the context and subject matter of Article XIII, § 10 requires a mandatory construction of its provisions concerning the State's participation in the cement business.

■ [¶ 12.] The interpretation of Article XIII, § 10 urged by Breck not only runs afoul of the plain, permissive language of the provision, but also violates reason and common sense. Such an interpretation would require the State to continue participation in the cement business indefinitely even in the face of declining revenues or losses. Surely it was not the intention of the people in enacting Article

XIII, § 10 in 1918 that the State operate a cement plant into perpetuity at a loss. It is the responsibility of this Court to interpret the constitution in a manner that avoids such absurd results. *See State v. Wilson*, 2000 SD 133, ¶ 14, 618 N.W.2d 513, 519 (this Court will not construe a constitutional provision to arrive at a strained, unpractical or absurd result).

[¶ 13.] Based upon the foregoing and absent reference to any constitutional provision prohibiting the Legislature from selling the State's property or the Cement Plant in particular, we hold that the sale of the Cement Plant is not prohibited by the South Dakota Constitution.

## ISSUE TWO

[¶ 14.] **Does the sale of the Cement Plant violate state law?**

■ [¶ 15.] Citing various provisions of SDCL ch 5–17,[5] Breck argues the sale of the Cement Plant violates state law. Breck contends the pertinent provisions of SDCL ch 5–17 limit the Cement Plant Commission to selling only surplus property or a subsidiary business belonging to the Cement Plant. Asserting the Cement Plant itself is not "surplus property" or a "subsidiary business," Breck argues the sale of the Cement Plant violates SDCL ch 5–17.

[¶ 16.] We decline to read the provisions of SDCL ch 5–17 as advocated by Breck. Contrary to her assertions, none of the statutes she cites mention the words "surplus property."[6] Rather, SDCL 5–17–15 authorizes the Cement Plant Commission to sell real property used by the Commission whenever "in its opinion" the property is "no longer needed in the operation of the state cement plant[.]" Similarly, SDCL 5–17–18 authorizes the Commission to sell personal property used in the operation of the Cement Plant whenev-

---

5. *See* SDCL 5–17–15; 5–17–16; 5–17–16.1; 5–17–18; & 5–17–40.

6. We note that the heading is not part of a statute. *See Olson v. City of Sioux Falls*, 63

S.D. 563, 566, 262 N.W. 85, 87 (1935)(the heading of a statute is inserted for convenience of reference and does not lessen or expand the meaning of a statute).

er "in its opinion" the property is "no longer needed in the operation of the state cement plant[.]" Obviously if the determination is made that the State should get out of the cement business, a determination permitted by the constitution as explained under issue one, the Cement Plant's property is no longer needed in its operation and the sale of that property is fully authorized by the statutes cited by Breck.

[¶ 17.] Moreover, and also contrary to Breck's assertions, the Legislature *did* amend SDCL ch 5–17 during its special session to include the following provision:

Notwithstanding any other provision of law, including but not limited to chapter 5–7, the South Dakota State Cement Plant Commission *when selling substantially all of its assets* may lease all of the mineral interests reserved to the State of South Dakota in all real property owned, sold, acquired, leased, or conveyed by the State of South Dakota acting by and through the South Dakota State Cement Plant Commission in a manner and upon terms acceptable to the commission. (emphasis added).

SB 1, § 5, 75th Leg., 2000 SpecSess. (SD 2000). Thus, even if SDCL ch 5–17 did not contemplate a sale of all Cement Plant property before the special session, the language emphasized above certainly makes clear that such a sale is now contemplated by the chapter.

[¶ 18.] Finally, we note the implications of the special legislative session itself. The Governor's proclamation convening the special session specifically provided that it was called to consider the "sale and disposal" of the Cement Plant and "the disposition of proceeds from the sale[.]" At the inception of the session, the Governor delivered a detailed address to a joint session of the Legislature devoted to an explanation of various aspects of the sale of the Cement Plant. During the course of the ensuing two day session, a total of five bills, three joint resolutions and one concurrent resolution were submitted and considered by the Legislature, all covering various aspects of the sale of the Cement Plant. *See* HB 1001, HJR 1001, SB 1, SB 2, SB 3, SB 4, SCR 1, SJR 1, SJR 2, 75th Leg, 2000 SpecSess (SD 2000). Ultimately, the Legislature passed the following bills and resolutions necessary to consummate the sale and to dispose of the proceeds:

1) An Act to amend South Dakota law in connection with the sale of substantially all of the assets of the South Dakota State Cement Plant Commission, to enable the continued operation and use of real property relating to the business of the cement plant, by amending chapter 43–2A relating to alien ownership of agricultural land restrictions, to amend chapter 47–9A relating to corporate farming restrictions, to amend Title 11 relating to zoning, to amend chapter 5–17 relating to the mineral leasing authority of the South Dakota State Cement Plant Commission, to zone South Dakota Cement Plant property, and to declare an emergency.—SB 1, 75th Leg, 2000 SpecSess (SD 2000).

2) An Act to revise certain provisions relating to constitutional amendments and submitted questions and to declare an emergency.—SB 2, 75th Leg, 2000 SpecSess (SD 2000).

3) An Act to set a special election for the voters' consideration of a constitutional amendment to Article XIII, § 10 and to declare an emergency.— SB 3, 75th Leg, 2000 SpecSess (SD 2000).

4) A Joint Resolution, Proposing and submitting to the electors at a special election designated by the Seventy-fifth Legislature, meeting in special session, an amendment to Article XIII of the Constitution of the State of South Dakota, relating to the creation and administration of a trust fund.—SJR 1, 75th Leg, 2000 SpecSess (SD 2000).

5) A Concurrent Resolution, Approving the sale of the South Dakota State Cement Plant.—SCR 1, 75th Leg, 2000 SpecSess (SD 2000).

[¶ 19.] While Breck is correct that the Legislature's rules do provide that concurrent resolutions such as SCR 1 approving the sale of the Cement Plant, do not have the force of law, she neglects to mention that the same rule provides that such a concurrent resolution may be used to "instruct a department of state government[.]" Joint Legislative Rule 6A–1(2), 75th Leg (SD 2000) as adopted in SenJourn 8, 75th Leg, 2000 SpecSess (SD 2000) & HseJourn 9, 75th Leg, 2000 SpecSess (SD 2000). Thus, SCR 1 was an appropriate means for the Legislature to instruct the Cement Plant Commission to proceed with the sale of the Cement Plant pursuant to its negotiations. Further, a resolution is indicative of "the will or opinion of the legislature on a particular subject of general concern." Robert E. Moore, Comment, *Legislative Resolutions: Their Function and Effect,* 31 TexLRev 417 (1953). Resolutions are "entitled to respectful consideration by the courts." 1A Norman J. Singer, Sutherland Statutory Construction § 29.08 (5th ed 1993).

[¶ 20.] The fundamental mission of a court in interpreting legislative acts is to ascertain and give effect to the intention of the Legislature (*see S.D. Subseq. Injury Fund v. Federated Mut.,* 2000 SD 11, ¶ 18, 605 N.W.2d 166, 170 (cardinal principle of statutory construction is to give effect to the legislative intent)), and the foregoing acts leave no doubt as to that intention here. Acceptance of Breck's contentions would mean that despite extensive negotiations and review by the Governor and Cement Plant Commission, despite the convening of a special legislative session devoted exclusively to the issue of the sale of the Cement Plant, despite the Legislature's consideration of nine separate pieces of legislation concerning various aspects of the sale and its passage of five pieces of legislation approving details of the sale and despite the Legislature's specific passage of a concurrent resolution endorsing the sale, we must now interpret its two day special session and its resulting legislation as idle and useless acts on the pretext that the sale is not legislatively authorized. This we will not do. This would be contrary to every charge imposed upon this Court in carrying out its interpretive function. *See City of Sioux Falls v. Ewoldt,* 1997 SD 106, ¶ 17, 568 N.W.2d 764, 768 (court's obligation is to interpret law in a manner avoiding absurd results); *Yankton Ethanol, Inc. v. Vironment, Inc.,* 1999 SD 42, ¶ 15, 592 N.W.2d 596, 599 (there is a presumption against a construction rendering a law ineffective or meaningless). *See also Scott v. North Dakota Workers Comp. Bureau,* 587 N.W.2d 153, 156 (N.D.1998) (it is presumed the legislature acts with a purpose and does not perform useless acts); *Bickel v. Jackson,* 530 N.W.2d 318, 320 (N.D.1995) (there is a presumption the legislature acts with purpose and does not perform idle acts).

[¶ 21.] Based upon the foregoing, we reject Breck's contentions that the sale of the Cement Plant violates state law.

### ISSUE THREE

[¶ 22.] **Does the manner in which the sale of the Cement Plant has been conducted violate public policy?**

[¶ 23.] Breck argues that the allegedly covert manner in which the Cement Plant was sold violates principles of public policy in a democratic government and voids the sale. While mentioning a number of terms used in describing the democratic process, she cites no legal authority for her policy contentions nor does she provide any authority on the effect these alleged policy violations should have on the sale of the Cement Plant

[¶ 24.] In addition, many of Breck's contentions under this issue are not supported by the record. She asserts that, in selling the Cement Plant, the Legislature

and Governor "totally usurped the power of the people," that the "people had absolutely no opportunity for input, either before, during or after the sale," that they "had no knowledge about the proposed sale," and, that they "had no part in the brief deliberations." This is simply not accurate.

[¶ 25.] First, Breck fails to provide any legal rationale for her assertion that the power of the people has somehow been usurped in the sale of the Cement Plant. In fact, the record shows that the people's democratically elected representatives assembled at the call of their democratically elected governor and, in a democratic fashion, the majority of them voted to approve the sale of the Cement Plant. While Breck and others may disagree with that decision, we fail to perceive how this democratic process usurps the power of the people. *See Independent Community Bankers Ass'n v. State*, 346 N.W.2d 737, 745 (S.D.1984) (the elected representatives of our citizens exercise the peoples' inherent political power and the Legislature exercises the peoples' will in enacting a provision).

[¶ 26.] Second, Breck's contentions over lack of public input and participation in deliberations are meritless as demonstrated by the fact that Breck herself appeared and testified before the Senate and the House during the special legislative session while those bodies were assembled as a joint committee of the whole to consider the sale of the Cement Plant. Sen. Journ. 14–15, 75th Leg., 2000 Spec.Sess. (S.D.2000) & Hse.Journ. 11, 75th Leg., 2000 Spec.Sess. (S.D.2000). This access was actually greater than normal citizen participation in the legislative process which is ordinarily limited to testimony before individual legislative committees or lobbying individual legislators.

[¶ 27.] Third, we reject Breck's argument of a lack of public knowledge about the sale of the Cement Plant. In that regard, we take judicial notice of the extensive news and media coverage of the sale before, during and after the Legislature's special session. *See Amador . Val. Joint Union H. Sch. Dist., Etc.*, 22 Cal.3d 208, 583 P.2d 1281, 1291, 149 Cal.Rptr. 239, 249 (1978)(court may take judicial notice of massive advance publicity and public discussion surrounding initiated constitutional amendment). *See also Sioux Falls Argus Leader v. Miller*, 2000 SD 63, ¶ 24, 610 N.W.2d 76, 87 (in entering "pretrial gag order" in child abuse prosecution the circuit court properly took judicial notice of extensive pretrial publicity including newspaper, radio and television coverage).

[¶ 28.] Breck does accurately state that the Governor kept certain details of the sale of the Cement Plant from all but the legislative leadership. However, she again fails to cite any particular provision of law violated by his action. Further, the Governor was direct and explicit about the need for confidentiality concerning certain particulars of the sale from the very opening of the special session and, during his opening address, he explained his reasons for keeping certain matters confidential. While Breck contends "there is no reason a public contract should be treated in the same manner as national intelligence information," she also cannot ignore that the State was engaged in negotiations to sell a multi-million dollar business that would normally function as a private or corporate enterprise. Surely if IBM and Microsoft find confidentiality necessary in certain business transactions, the State's need for some modicum of confidentiality while operating in a similar arena is hardly startling.

[¶ 29.] In *Community Bankers Ass'n, supra*, a group of plaintiffs challenged the constitutionality of a legislative act on the basis that the Legislature violated the Bill of Rights in its enactment. The challenge involved various contentions about the democratic process similar to those Breck raises here. In rejecting those contentions, this Court noted:

Where a rule of conduct applies to more than a few people it is impracticable that every one should have a direct voice in its adoption. The Constitution does not require all public acts to be done in town meeting or an assembly of the whole. General statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard. Their rights are protected in the only way that they can be in a complex society, by their power, immediate or remote, over those who make the rule.

*Community Bankers Ass'n*, 346 N.W.2d at 745 (quoting *Bi–Metallic Inv. Co. v. Colorado Bd. of Equal.*, 239 U.S. 441, 445, 36 S.Ct. 141, 142, 60 L.Ed. 372, 375 (1915)). Much the same is true here. The people's rights and interests in the Cement Plant are protected by their power over the Legislature responsible for making a decision about its sale. If individual legislators felt ill prepared to make that decision or found some deficiency in the information they were provided on which to base it, they had the simple option of voting against it. This they did not do. Rather, they approved the sale by a wide majority. The wisdom of that decision is not an appropriate subject for this Court's review. *See Community Bankers Ass'n, supra* (this Court will not look into the motives, wisdom or haste connected with the passage of statutes). Ultimately, if the people disagree with the sale, are dissatisfied with it and disapprove of those who made it, they may register their discontent by their control over those individuals at the polls. *See id. (disagreement with public policy and disapproval of officials' responsiveness is to be registered principally at the*

polls). This is the heart of the democratic process.

[¶ 30.] SDCL 1–1–23 states that the sovereign power of this state, otherwise known as its public policy, is expressed in part by "statutes enacted by the Legislature[.]" *Veeder v. Kennedy*, 1999 SD 23, ¶ 23, 589 N.W.2d 610, 616. Although Breck cites none, even if there were some form of common law authority supportive of her position, under SDCL 1–1–23 it is abrogated by legislative enactments discussed herein. *Id.*[7]

[¶ 31.] Based upon the foregoing, we find no violation of public policy in the manner in which the sale of the Cement Plant has been conducted.

## ISSUE FOUR

[¶ 32.] **Did the Legislature improperly attach emergency clauses to the three bills approving the sale of the Cement Plant?**

[¶ 33.] Under S.D. Const.Art. III, § 1, the people reserve to themselves the right to require laws enacted by the Legislature to be referred for a public vote before going into effect unless the laws are "necessary for the immediate preservation of the public peace, health or safety, [or for the] support of the state government and its existing public institutions." *See also State v. Larson*, 81 S.D. 540, 138 N.W.2d 1 (1965). Under S.D. Const.Art. III, § 22, laws enacted by the Legislature do not take effect until ninety days after the session in which they are passed unless the Legislature, by a two-thirds vote of all members in each House, declares an emergency to exist and directs an earlier effective date. *See also Gravning v. Zellmer*, 291 N.W.2d 751, 757 (S.D.1980).[8] During

7. Likewise Breck fails to identify any rules of the Legislature it failed to follow when it met in this special session and enacted the legislation dealing with the sale of the Cement Plant. *See generally* Rules of the South Dakota Legislature, Seventy-fifth Session (2000).

8. SDCL 2–14–16 states:

Subject to the provisions of the Constitution and statutes relating to vetoes and the referendum, an act of the Legislature which does not prescribe when it shall take effect, if passed at a regular session, takes effect on the first day of July after its passage and if passed at a special session on the ninety-

its special session, the Legislature, by a two-thirds vote, attached emergency clauses to each of the three bills it passed. It declared them necessary for the immediate preservation of the public peace, health or safety or for the support of state government and its institutions. It declared an emergency to exist and required that they take effect upon passage and approval. Breck argues that the attachment of these emergency clauses was improper and that the people have been deprived of their opportunity to refer these acts for a public vote.

[¶ 34.] The principles by which we review such contentions were detailed by this Court in *Larson, supra* and summarized and reinforced in *Gravning,* 291 N.W.2d at 757–758:

> Whether an act falls within one of the two classes of laws that are excepted from the referendum by art. III, § 1 is a matter subject to judicial review. Whether an emergency exists within the meaning of art. III, § 22 is a matter solely for the Legislature to decide, however, so long as the law to which the emergency clause is attached in fact falls within one of the two excepted classes.

* * *

> This court in determining whether a law is necessary for the support of the state government and its existing institutions will consider the effect upon such support of delay incident to referral and the consequences if the law is defeated. If the efficient operation of the state government would be unaffected by the delay or possible defeat, the law in such instance cannot be said to be necessary so as to prevent a referral.
>
> While this court must give to the action of the legislature every favorable presumption, the mere fact that a statute is for the support of the state government will not preclude judicial

first day after the final adjournment of such

review of the question whether the act is "necessary" for such support. This court, however, will not enter upon an ascertainment of facts through formal proof by sworn witnesses and authenticated documents to determine necessity of a statute for the support of the state government. The scope of the review is limited to what appears upon the face of the act and facts within the court's judicial knowledge.

* * *

> In order that this court may be justified in declaring that the act in question is not necessary for the support of the state government and its existing institutions and therefore subject to referendum it must at least appear from facts of which we may judicially notice that the conclusion is not reasonably disputable ... *"When it appears from the information at hand that the facts are such as to render the conclusion to be drawn therefrom fairly debatable, the matter is for the determination of the Legislature and the court may not set up its judgment against a legislative determination."*

* * *

> We must give to the legislative determination that the law in question is necessary every favorable presumption. As ordinarily considered the existence of a rational basis for a legislative judgment of necessity is dependent upon facts within the sphere of judicial notice at the time of enactment.

In reviewing the question of the necessity of the support provided by the act in question, we must presume that the Legislature availed itself of the opportunity to determine the facts when it made its determination that the act was necessary for the support of state government

session.

and its existing public institutions. (citations omitted) (emphasis added).

[¶ 35.] In addition to the foregoing, we note that this Court has twice observed that "necessity" in terms of whether a law is necessary for the support of state government and existing institutions not only means securing additional revenue, but also means "maintaining existing amounts and ... preventing a shriveling of present sources of revenue." *Larson,* 81 S.D. at 547, 138 N.W.2d at 5. *See also State v. Morrison,* 61 S.D. 344, 347, 249 N.W. 563, 564–565 (1933). The Governor presented just such a case here. In his address at the opening of the special session, the Governor provided numerous facts, figures, charts and graphs in support of his argument that, despite solid profits in recent years, changing market forces and the slowing economy as well as mounting concentration and competition in the cement industry pose significant threats to the continued viability and profitability of the Cement Plant. The entire focus of his message was that the expeditious sale of the Cement Plant and the investment of the proceeds was necessary to sustain the income of State Government at current levels and to prevent a financial decline.

[¶ 36.] We need not repeat the details of the Governor's address here. It is not our function in this review to evaluate the merits of his arguments, determine their accuracy or to assess the soundness of his business determinations, judgments and conclusions. *See Gravning,* 291 N.W.2d at 757 (this Court will not enter upon an ascertainment of facts through formal proof to determine the necessity of a statute for the support of state government). These were matters for legislators to consider in their debate and in their decision-making process over the sale of the Cement Plant. It is simply our function to determine if the arguments and information provided by the Governor and considered by the Legislature were sufficient to raise a "fair debate" over the necessity of the sale. *See id.* (where facts are such as to render the conclusion to be drawn fairly debatable, the issue of necessity is for determination by the Legislature). Clearly in this instance they were. Therefore, we will not set up our judgment against the ultimate legislative determination that the sale of the Cement Plant is necessary for the support of state government and its existing public institutions. *See id.* We find no impropriety in this legislative determination and, therefore, can find no impropriety in the Legislature's attachment of emergency clauses to the bills effecting the sale. *See Gravning, supra* (whether emergency exists under Article III, § 22 is a matter solely for the Legislature to decide so long as law to which emergency clause is attached is in one of the classes excepted from the referendum process by Article III, § 1).

[¶ 37.] As a final matter, the defendants and intervenors raise contentions over a cost issue previously raised by Breck before the trial court and mentioned in her notice of appeal. Since the trial court did not resolve the issue and because the issue has not been further briefed or argued by Breck on appeal, we decline to address it.

[¶ 38.] Affirmed.

[¶ 39.] MILLER, C.J., KONENKAMP, J., and RUSCH, C.J., concur.

[¶ 40.] AMUNDSON, J., concurs in part and dissents in part.

[¶ 41.] RUSCH, C.J. for SABERS, J., disqualified.

AMUNDSON, Justice (concurring in part, dissenting in part).

[¶ 42.] I concur on issues 1, 2 and 3. I, however, part company with the majority as to issue 4. Although I agree that the sale of the cement plant will probably benefit the State, I cannot disregard my solemn duty to interpret our state constitution. As stated by Justice Biegelmeier in his dissent in *State v. Jorgenson,* 81 S.D. 447, 136 N.W.2d 870, 881 (1965),

It is not a pleasant duty to examine questions involving the constitutionality of acts of the legislature. The result may be such as necessarily compels a court to declare the acts of a co-ordinate branch of the government of no effect, and the reported cases show with what reluctance courts are compelled to conclusions involving such grave and delicate consequences. Yet a court can no more avoid this than any other duty. So much was said by Kingman, C. J., in *Graham v. Horton*, 6 Kan. 343 (2nd ed 209). Our duty, therefore, is a responsibility which, as with other departments, we bear with equal fidelity to the people of our state. It is with that frame of mind that this duty is assumed.

[¶ 43.] In examining this record, it is patently clear that the facilitating acts of the Legislature do not go to the immediate support of government. While these acts will certainly assist in the support of government in the future, it cannot be said that the Legislature offered a rational basis for declaring the sale of the cement plant an emergency.

[¶ 44.] The people, under our constitution, have the right to vote on legislation through the referendum process, unless the Legislature has declared an emergency. As this Court stated in *State ex rel. Wegner v. Pyle*, 55 S.D. 269, 226 N.W. 280, 283 (1929), "[t]here can be no power in the Legislature to conclude by its action a reserved right belonging to the people. To so hold would be to sanction a usurpation of power and make the Legislature supreme.... If it is necessary, the voters can adopt it." Without a showing of an immediate need to declare an emergency to support state government, the people should be able to cast their vote if they are able to obtain sufficient signatures to place the enacted law on the ballot. Although deference is given to legislative acts, such deference does not allow for the circumvention of constitutional provisions in order to expedite a favorable sale of a state asset, which sale has been approved by all members of this Court.

[¶ 45.] Therefore, I respectfully dissent on issue 4.