MEIERHENRY, Retired Justice.
[¶ 1.] When our state founders laid the cornerstone for our state capítol building in 1908, the distinguished leader and Dakota Territorial Superintendent of Public Instruction, Gen. W.H.H. Beadle, addressed the crowd. He spoke of the importance of education to the future of the state:
The advance of every free state depends upon the broad intelligence of its citizens. Because we are a state, republican in form, education of all the people becomes the highest duty of the state. Nothing can be so important except the struggle for the very existence of the republic. The genius of the poorest must have equal chance with the opportunity of the rich. The true state will not disregard the welfare of the humblest orphan. Our resources of farm, orchard, and mine, our soils and our water supply, our rocks, our clays, must be scientifically studied and mastered; our livestock, our entire productive possibilities require a scientifically trained and educated people. As our population doubles and crowds our area, this need increases. This training should be masterly and broad and prepare as fully also for all civic and social duties. Not for wage earning alone, nor for money making alone, must we educate. All skill, all technical training, all science, all the industries, can not together, but unaided, save and develop all that human society and government have in charge for our permanent welfare. Technology is required for the world’s progress, but it is not all the story of man’s advancement.
[[Image here]]
The mastery of history, government, literature, philosophy; the knowledge of all the world and its mutual and conflicting interests, of the origin and nature of human society and “the grand results of time” must be the possession of those who are to lead us in the profound questions bound up in the state and national and international interests.
[[Image here]]
The great, final, single, comprehensive aim of education and of the highest education is the equipment of men for moral leadership. I believe that all this should be done inside the state, that all scholars, all teachers and all trained citizens should be made by institutions within our own state. Within our borders, under our laws and institutions, under the discipline of our own conditions and inspired by our state pride, all this can best be done. All the elements of, and inspiration for it, should be thoroughly given in our common schools, from our libraries and at our firesides.[1]
*623 General Beadle’s convictions are embedded in the language of South Dakota’s Constitution.
[¶ 2.] Article VIII, Section 1 of the South Dakota Constitution emphasizes the importance of a “general and uniform system of public schools” and places the duty to establish the system on the State Legislature:
The stability of a republican form of government depending on the morality and intelligence of the people, it shall be the duty of the Legislature to establish and maintain a general and uniform system of public schools wherein tuition shall be without charge, and equally open to all; and to adopt all suitable means to secure to the people the advantages and opportunities of education.
(Emphasis added.) The Legislature also has the duty to fund education. Article VIII, Section 15 of the South Dakota Constitution directs the Legislature to provide through general and local taxation as follows:
The Legislature shall make such provision by general taxation and by authorizing the school corporations to levy such additional taxes as with the income from the permanent school fund shall secure a thorough and efficient system of common schools throughout the state.
[¶ 3.] Whether the Legislature has met the constitutional requirements of adequately funding education is the central question in this action. The plaintiffs — a group of children who attend public schools in South Dakota school districts and their parents and natural guardians— claim that the present system of funding education is unconstitutional because it does not provide all children with an adequate and quality education. Specifically, the plaintiffs ask for a declaratory ruling that Article VIII, Sections 1 and 15 mean (1) “that the South Dakota Constitution entitles all children to a free, adequate and quality public education,” and (2) that the present system of funding is unconstitutional because it does not provide all children with an adequate and quality education.
[¶ 4.] Clearly, the language of the South Dakota Constitution guarantees every child a free public education to provide them with “the advantages and opportunities of education.” What this means and its relationship to funding, however, is a trickier question.[2] To answer that ques *624 tion, we look at the plain meaning of the language and the intent of its drafters. See Brendtro v. Nelson, 2006 S.D. 71, ¶ 34, 720 N.W.2d 670, 681-82. The drafters used key words in defining the Legislature’s duty. They required the Legislature to “establish and maintain a general and uniform system of public schools, ... adopt all suitable means to secure to the people the advantages and opportunities of education,” and provide funding to “secure a thorough and efficient system of common schools throughout the state.” S.D. Const, art. VIII, §§ 1, 15 (emphasis added). The plain and ordinary meaning of these key words appears unchanged since 1889 when South Dakota’s Constitution was ratified.[3] General means “[p]er-taining to, affecting, or applicable to, each and all of the members of a class, kind, or order”; uniform is “[h]aving always the same form, manner, or degree”; and system is “[a]n aggregation or assemblage of objects united by some form of regular interaction or interdependence.” Webster’s New International Dictionary of the English Language 1043, 2777, 2562 (2nd ed.1937). Suitable means “suited to ... one’s needs, wishes, or condition, the proprieties, etc., appropriate; fitting,” and secure is “to make secure or certain; to ensure.” Id. at 2522, 2263. Advantage and opportunity are similarly defined as “[a]ny condition, circumstance, ... or means, particularly favorable to success, or to any desired end,” or “juncture of circumstances favorable to some end.” Id. at 38, 1709. Thorough means “so complete as to leave nothing unaffected or wanting”; and efficient signifies “[cjapable, competent, [and] able.” Id. at 2631, 819.
[¶ 5.] Thus, the plain and ordinary meaning of the language of Article VIII, Section 1 requires the Legislature to establish a general system of free public schools, each of the same form, and to employ all appropriate and fitting means to ensure children in South Dakota are afforded the advantages and opportunities of education. Additionally, Article VIII, Section 15 directs the Legislature to provide a method of general and local taxation that, along with income from the permanent school fund, ensures the existence of a system of common schools throughout the state. The school system must be complete in all respects, as well as capable, competent, and able.
[¶ 6.] We check this interpretation against the historical context and intent of the framers of the South Dakota Constitution. See Campbell Cnty, 907 P.2d at 1259. See also Doe v. Nelson, 2004 S.D. 62, ¶ 10, 680 N.W.2d 302, 306. The importance of education to those early leaders is unmistakable.
*625 [¶ 7.] As early as 1861, the organizers of the Territory of Dakota set aside land for schools. Comm, on Territories, 49th Congr., 1st Sess., Rep. to Accompany Bill S. 967 at 18, 20 (1886). Section 14 of the Organic Act organizing the Territory directed that sections sixteen and thirty-six of each township should be reserved for schools. Organic Act of March 2,1861, ch. 86, § 14, 12 Stat. 239, 243 (1863). Thus, “[z]eal for learning has characterized the South Dakotan from the earliest period.” 1 Doane Robinson, History of South Dakota 470 (B.F. Bowen & Co.1904). “From the earliest beginning of the Dakota Territory, the [citizens] have been vitally interested in educating their children.”[4] As described by Pattinson F. McClure, Dakota Territorial Commissioner of Immigration: “No matter how recent the settlement, how ambitious the strife for worldly possessions, the church and school are there, the site and foundations for which occupy the first cares of every new community.” [5] General Beadle reflected later in his life that: “[PJeople in territorial days ... would have a school, if it met in a log or sod shanty or in a room in a private home, or in the first little church.”[6]
[¶ 8.] In his message to the First Territorial Legislature in 1862, newly appointed Governor William Jayne gave voice to the settlers’ zeal for education, observing:
There is no subject more vital to the prosperity and general welfare of the territory than the subject of education. The virtue, intelligence, and public happiness of a people, and all that conduces to the advancement of the prosperity, wealth, and power of a country, is intimately associated with, and dependent upon, the development of the educational interest of the state. In communities where truth, virtue, intelligence and knowledge prevail, there crime is rare, and poverty almost unknown. Every dollar of taxes levied for the support of schools lessens, by many dollars, the taxes which would be assessed for the support of prisons and poor houses.[7]
[¶ 9.] The Territorial Legislature authorized General Beadle, who became the Territorial Superintendent of Public Instruction in 1878, to visit the capitals of five other states to study their laws and experiences in utilizing their public school lands.[8] Based on his observations, he was to draft constitutional provisions and statutes to obtain the best returns from Dakota’s school lands.[9] General Beadle visited the capitals of Iowa, Minnesota, Wisconsin, Illinois, Indiana and Michigan.[10] He later issued a report recommending that:
The great body of common schools of the state should be so organized as to *626 work in harmony under one general plan, and enable every person to prepare for admission from the lowest grade to the highest education the state can give by successive stages of study and qualification. The common schools can be supported by the grant of school lands if managed with wisdom and integrity!.] [11]
[¶ 10.] General Beadle wanted to secure permanent funding for public education. He was afraid that territorial school lands (totaling in the millions of acres) would be sold to land speculators at low prices to meet the short term needs of public education.[12] General Beadle and other founders were determined to preserve the school lands until their value increased so that they could be sold for higher prices and provide maximum support for public education into the future.[13] General Beadle’s plan was that all money from the sale of school lands (for not less than $10 per acre) would be safely invested in a school fund to permanently endow education.[14] Clearly, ardent support of public education motivated the founders of our state.
[¶ 11.] Public education and desire for permanent funding prominently took their place in the state’s draft constitutions. The draft constitution, prepared at the constitutional convention in Sioux Falls in 1888, incorporated provisions that would later become Article VIII of the South Dakota Constitution.[15] Article VII, Section 1 of the draft constitution provided: “The stability of a republican form of government depending mainly upon the intelligence of the people, it shall be the duty of the Legislature to establish [a] general and uniform system of public schools.”[16] Per General Beadle’s plan, Article VII, Sections 2, 3, and 4 of the draft required creation of a permanent trust fund largely from the proceeds of the sale of school lands for the maintenance of public schools in the state.[17] Section 4 of the draft prohibited the sale of school lands for less than $10 per acre.[18] Section 5 of the draft provided: “The Legislature shall make such provision by taxation or otherwise, as, with the revenue from the permanent school fund, shall secure a thorough and efficient system of common schools throughout the State.” 1 Dakota Constitutional Convention, supra note 15, at 30.
[¶ 12.] Although Congress refused to recognize the draft constitution of 1883, its education provisions survived largely intact through two later constitutional conventions in 1885 and 1889. See id. at 44-48.[19] Those provisions formed the foundation for current Article VIII of the South Dakota Constitution, adopted by the voters in 1889 — the same year South Dakota for *627 mally became a state.[20]
[¶ 13.] The constitutional framers’ zealous efforts to preserve school lands as a permanent school funding source demonstrate their strong commitment to education and its significance to the citizenry and the economic and institutional development of this state. This historical context gives insight into the intent and meaning of the constitutional provisions. The Wyoming Supreme Court, interpreting a similar constitutional provision, also found historical context instructive. The court wrote:
From this history, we can conclude the framers intended the education article as a mandate to the state legislature to provide an education system of a character which provides [state] students with a uniform opportunity to become equipped for their future roles as citizens, participants in the political system, and competitors both economically and intellectually.
Campbell Cnty. I, 907 P.2d at 1259 (citing Kukor v. Grover, 148 Wis.2d 469, 436 N.W.2d 568, 589-90 (1989)). Other courts have interpreted educational mandates in their constitutions comparably.[21] We believe the framers of South Dakota’s constitutional provision intended a similar mandate to our State Legislature.
[¶ 14.] We agree with the plaintiffs that the language of South Dakota’s Constitution means that all children are entitled to a free, adequate, and quality public education. The constitutional language and intent of the framers guarantee the children of South Dakota a constitutional right to an education that provides them with the opportunity to prepare for their future roles as citizens, participants in the political system, and competitors both economically and intellectually. The constitutional mandate does not contemplate a system that fails to educate all children or leaves pockets of inadequate conditions and achievement as a result of insufficient funding. As General Beadle so eloquently stated, “The genius of the poorest must have equal chance with the opportunity of the rich.” Coursey, supra note 1, at 87. The question before us is whether the legislative scheme for funding education meets the constitutional requirements.
BURDEN OF PROOF AND STANDARD OF REVIEW
[¶ 15.] For the plaintiffs to prevail, they must show that the public school funding system is unconstitutional because it fails to provide students with an education that gives them the opportunity to prepare for their future roles as citizens, participants in the political system, and competitors both economically and intellectually. Our review is de novo. See People *628 in Interest of Z.B., 2008 S.D. 108, ¶ 5, 757 N.W.2d 595, 598; Green v. Siegel, Barnett & Schutz, 1996 S.D. 146, ¶ 7, 557 N.W.2d 396, 398.
[¶ 16.] We have consistently considered the constitutionality of legislative acts according to “well-known principles”: “Any legislative act is accorded a presumption in favor of constitutionality and that presumption is not overcome until the unconstitutionality of the act is clearly and unmistakably shown and there is no reasonable doubt that it violates fundamental constitutional principles.” South Dakota Ass’n of Tobacco & Candy Dist. v. State By & Through Dept. of Revenue, 280 N.W.2d 662, 664-65 (S.D.1979) (citations omitted). The “presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption.... ” SDCL 19-11-1. See also Hubbard v. City of Pierre, 2010 S.D. 55, ¶ 16, 784 N.W.2d 499, 506 (citing Estate of Dimond, 2008 S.D. 131, ¶ 9, 759 N.W.2d 534, 538). A presumption is rebutted “[w]hen substantial, credible evidence has been introduced .Id. A presumption of constitutionality requires weighty evidence to overcome it. See Dimond, 2008 S.D. 131, ¶ 9, 759 N.W.2d at 538. Challengers also have the burden of persuading the court that “there is no reasonable doubt that it violates fundamental constitutional principles.” South Dakota Ass’n, 280 N.W.2d at 664-65.[22]
[¶ 17.] In the present case, the plaintiffs have the burden of persuading the Court beyond a reasonable doubt that the public school system fails to provide students with an education that gives them the opportunity to prepare for their future roles as citizens, participants in the political system, and competitors both economically and intellectually, and that this failure is related to an inadequate funding system.
ANALYSIS

Current Funding Sources and Funding Formula

[¶ 18.] We begin with an overview of the state funding system. The two main sources of revenue for the 161 public school districts are state aid and local property taxes. See S.D. Const, art. VIII, § 15. The districts also depend on other *629 revenue sources, such as borrowed funds through bond issues; funds from federal, state, or other political subdivisions; and funds received from fines and penalties. SDCL IS — 16—l.[23]
[¶ 19.] Prior to 1995, the Legislature funded school districts through an expenditure driven funding formula. The more a school district spent, the more state funding it received. The constitutionality of the formula was unsuccessfully challenged on equal protection grounds in state circuit court in 1994. See Bezdichek v. State, 1994 S.D.C.C. 34, Hughes County Civ. No. 91-209 (S.D. 6th Jud.Cir.1994). The circuit court decision was not appealed. The South Dakota Legislature, however, revised the formula in the 1995 legislative session to take effect January 1, 1997. The revised formula funded districts based on an established per student allocation (PSA), a district’s enrollment, and the amount of local property tax levied.
[¶ 20.] The revised formula requires a multi-step calculation starting with the legislatively designated PSA. SDCL 13 — 13— 10.1(4). The 1995 Legislature set the PSA at $3,350 beginning in fiscal year (FY) 1998 to be increased annually by the rate of inflation according to the Consumer Price Index (CPI) or by 3%, whichever was less. See 1995 S.D. Sess. Laws ch. 77, § 3. See also SDCL 13-13-10.1(3)-(4). Accordingly, the Legislature annually increased the PSA and, in some years, by more than the inflation rate. By the time of trial, the PSA was $4,642.
[¶ 21.] Next, the formula establishes a school district’s “local need.” Local need is the product of the PSA multiplied by a school district’s K-12 enrollment determined on a specified date in the fall. It may also include a “small school adjustment” if the enrollment is less than 600 students. SDCL 13-13-10.1(2A), (2C), (5). The small school adjustment increases the PSA by a fixed per pupil amount according to a statutory sliding scale maximizing at $847.54. SDCL 13-13-10.1(2C).[24]
[¶ 22.] Finally, the formula determines a school district’s “local effort,” which is the total amount of local property tax levied. The local effort is then subtracted from the district’s local need to arrive at the amount of state aid allocated to the district. SDCL 13-13-10.1(6), -73.
[¶ 23.] In addition to revising the funding formula, the 1995 Legislature capped the local property tax levy. The levy caps effectively limit the amount a school district can raise locally. See 1995 S.D. Sess. Laws ch. 57, § 37; 1995 S.D. Sess. Laws ch. 77, § 6. The 1995 Legislature originally capped levies at the following amounts based upon three different classifications of local property: $16.75 per thousand dollars of taxable valuation for non-agricultural land; $6.25 per thousand dollars of taxable valuation for agricultural land; and $10 per thousand dollars of taxable valuation for owner-occupied single family *630 dwellings. Id. After 1995, the Legislature steadily lowered these caps during every subsequent annual legislative session.[25] By the time of trial, the following caps were in effect for taxes payable in 2009: $8.78 per thousand dollars of taxable valuation for non-agricultural land; $2.61 per thousand dollars of taxable valuation for agricultural land; and $4.10 per thousand dollars of taxable valuation for owner-occupied single family dwellings. 2008 S.D. Sess. Laws ch. 48, § 1.
[¶ 24.] The Legislature allows school districts to tax at less than the statutory maximum levies, but the state aid formula imputes the maximum to the local district in calculating its local effort. SDCL 10-12^42, 13-18-10.1(6). School districts may also “opt out” of the maximum levies and tax at higher rates. SDCL 10-12-43. If a school district opts out, the funds go into the school district’s general fund in addition to the funds received under the state aid formula. Id.
[¶ 25.] State funding based on the formula is the largest source of revenue for local districts. Local property taxes are usually the next major source of revenue. Other lesser sources of revenue include state educational trust funds, county fines, federal grants, school district gross receipts, and bank franchise taxes. See S.D. Const, art. VIII, § 3. School districts also receive other funds for education-related purposes such as capital outlay and pension funds collected through local revenue and special education funds from federal, state, and local sources. A district may also be eligible for a sparsity benefit based on enrollment, size, and distance criteria. See SDCL 13-13-78 to -79.[26]

Alleged Funding Sgstem Flaws and Inadequacies

[¶ 26.] The plaintiffs identify problems with the school funding system that they claim make it structurally flawed and inadequate. They claim that the system is arbitrary and irrational because funding is not based on actual costs of providing students with a constitutionally adequate education and does not align funding with need.
[¶ 27.] Other jurisdictions have found school funding systems unconstitutional because funding was not based on actual costs. The Montana Supreme Court in Columbia Falls Elementary School District No. 6 v. State, held that, “[u]nless funding relates to needs such as academic standards, teacher pay, fixed costs, costs of *631 special education, and performance standards, then the funding is not related to the cornerstones of a quality education.” 326 Mont. 304, 109 P.3d 257, 262 (2005). The Wyoming Supreme Court determined that Wyoming’s school funding system was unconstitutional because the distribution formula was not based upon the actual costs of providing a basic education package to each student. Campbell Cnty. I, 907 P.2d at 1277.
[¶ 28.] Whether South Dakota’s funding formula is based upon actual costs is unclear. The parties offered no evidence of actual costs. Cf Campbell Cnty. I, 907 P.2d at 1251 (where the plaintiffs presented a cost study as evidence). Several witnesses, including two legislators, testified that the funding formula only provides a certain amount of funding to each school district, regardless of need. An SDDOE employee testified that she provided data to the 1995 Legislature when the formula was being developed. The data included general fund expenditures, the old funding formula “inclusions,” and school enrollment. The witness further indicated the formula’s original 1997 PSA derived from the costs and expenditures of all the school districts in the 1993-94 school year increased by 3.3% per year for inflation. We are unable to surmise from the evidence if the Legislature considered the actual cost of educating a student as part of the formula. Without evidence to the contrary, a court must presume the Legislature exercised its power to investigate and determine such facts. See State ex rel. Payne v. Reeves, 44 S.D. 568, 595, 184 N.W. 993, 999-1000 (1921). See also State ex rel. Kornmann v. Larson, 81 S.D. 540, 551, 138 N.W.2d 1, 7 (1965); Payne v. Jones, 47 S.D. 488, 491, 199 N.W. 472, 473 (1924).
[¶ 29.] Even if the Legislature used historical education costs instead of actual costs, the formula may still be valid. The Wyoming Supreme Court recognized that historical costs can be a starting point in State v. Campbell County School District (Campbell Cnty. II), 19 P.3d 518 (Wyo.2001). After determining that Wyoming’s funding formula was unconstitutional in Campbell County I, the court directed the Wyoming Legislature to develop a school funding system based upon costs. 907 P.2d at 1279. The Wyoming Legislature retained a consulting firm for that purpose. See Campbell Cnty. II, 19 P.3d at 537. Rather than carrying out a study of actual costs, however, the consulting firm determined costs based upon statewide averages of past school district expenditures and “professional judgment.” Id. The Wyoming Supreme Court held that, while this was not an ideal approach, the Wyoming Legislature had to “start somewhere” and use of past statewide average expenditures to estimate costs was appropriate. Id. at 538. The court went on to hold, however, that “regular and timely inflation adjustments” would be essential to funding the real costs of education. Id. at 549.[27]
[¶ 30.] When the 1995 South Dakota Legislature developed the current formula, it based the starting PSA for 1997 upon actual 1993-94 school district expenditures plus a 3.3% inflation factor. The Legislature then made provision in the new formula for continuing annual inflationary adjustments to the PSA according to the rate of inflation under the CPI or by 3%, whichever was less. 1995 S.D. Sess. Laws ch. 77, § 3. See also SDCL 13-13-10.1(3)- *632 (4). The Legislature annually appropriated the required inflationary adjustment to the PSA for each year the formula was in place. In some years, the Legislature appropriated a higher rate of inflation than the formula r'equired. Based on the evidence at trial, it appears that the school funding formula was originally designed in line with historical cost data as regularly adjusted for inflation.
[¶ 31.] The plaintiffs, however, find problems with the formula’s inflation provision. They argue it is structurally defective because, in some years, annual inflation may exceed the 3% cap in the formula. See SDCL 13-13-10.1(3)-(4). In those years, education funding would fall behind actual costs. This argument has merit; however, the plaintiffs have not shown that this has occurred. At the time of trial, the Legislature had increased the PSA by more than the formula’s required inflation rate in four of the years preceding trial.
[¶ 32.] The plaintiffs also criticize the formula’s reliance on the CPI as a measure of inflation. They assert that the CPI does not capture inflationary increases related to salaries and benefits which typically constitute at least 75% of a school district’s operating budget. The plaintiffs presented no evidence to support this claim, except for one legislator’s general opinion voiced in a 2007 e-mail message to Dr. Melmer without any specifics. The CPI is a commonly used measure of inflation frequently relied upon in a number of legal contexts. See, e.g., Enchanted World Doll Museum v. Buskohl, 398 N.W.2d 149, 150 (S.D.1986) (CPI used as a basis for inflationary adjustments in a contract for deed); SDCL 62-4-7 (increases in workers’ compensation benefits based upon the CPI); ARSD 74:07:01:07 (dollar amounts for environmental financial assurance adjustable based upon the CPI). See also Campbell Cnty. II, 19 P.3d at 549 n. 32 (CPI used in a school funding case to document annual inflation rates and the erosion of purchasing power from 1995 to 2000). Absent more persuasive evidence of its inadequacy, using the CPI as a measure of inflation does not render the funding formula unconstitutional. On this record, the plaintiffs have not shown that inflationary conditions skewed the formula or that the funding formula is unrelated to actual costs.
[¶ 33.] The plaintiffs next assert that the replacement of the small school factor with the small school adjustment in 2007 eliminated an annual inflationary increase for smaller school districts. The small school factor and small school adjustment contemplate economies of scale; that is, smaller districts incur greater cost per student than larger districts. The small school factor utilized a schedule of multipliers to artificially increase the enrollment of school districts with fewer than 600 students. See SDCL 13-13-10.1(2). For example, school districts with fewer than 200 students multiplied their enrollments by 1.2. SDCL 13-13-10.1(2)(a). That product was then multiplied by the PSA, as annually adjusted for inflation, to arrive at local need. SDCL 13-13-10.1(5) (Supp. 1996). The 2007 amendments changed this calculation. Enrollments are no longer artificially increased; actual enrollment figures are used instead. See SDCL 13-13-10.1(2A), -10.1(5). Smaller school districts simply receive an additional fixed per pupil amount according to a statutory sliding scale maximizing at $847.54 and declining as enrollments grow to 600. SDCL 13-13-10.K2C), -10.1(5). There is no provision for an annual inflation adjustment to this fixed per pupil amount. Thus, small school districts do lose the benefit of an inflationary increase in their special adjustment every year.[28]
*633 [¶ 34.] Finally, the plaintiffs contend that opt outs, intended as an education enhancement mechanism, have instead become a tool of survival for many school districts. Since a school board’s decision to opt out can be referred (see SDCL 10-12-43), the plaintiffs claim the decision to adequately fund education defaults to a majority vote of local taxpayers in violation of the constitution.
[¶ 35.] The constitution makes funding education both a state and local school district responsibility. S.D. Const, art. VIII, § 15. See also Olson v. Guindon, 2009 S.D. 63, 771 N.W.2d 318. It requires the Legislature to make provision “by general taxation and by authorizing the school corporations to levy such additional taxes as with income from the permanent school fund shall secure [the school system].... ” S.D. Const, art. VIII, § 15. Ultimately, however, the constitution imposes the duty on the Legislature alone to “maintain” the school system and to devise the state and local tax system that will “secure” it. S.D. Const, art. VIII, §§ 1, 15. Whatever system the Legislature devises, therefore, must be sufficient to ensure the funding of a constitutionally adequate school system in every school district. A referendum conflicts with this constitutional requirement if it permits the voters in a district to reject taxes or levies necessary to fund a constitutionally adequate school system in the district.
[¶ 36.] If an opt out is necessary to fund a constitutionally adequate school system, it may be problematic, especially if the opt out fails at the voting booth. Based upon the testimony provided, however, nearly all of the focus districts[29] attempting opt outs ultimately were able to pass them. The exception was the Bon Homme School District which, despite the rejection of two opt out attempts in 2000-2001, continued to operate until the time of trial, continued to provide the required curriculum, and produced academic results consistent with the other focus districts. We find this record insufficient to demonstrate a constitutional violation in the referral of any particular opt out.

Educational Results as a Factor in Constitutional Determination

[¶ 37.] Even if there are flaws and inadequacies in the school funding formula and opt out provision, the plaintiffs still must show the correlation between funding levels and a constitutionally adequate education. Thus, educational results *634 are also a factor in determining constitutionality of the system. In other words, are the students receiving the education required by the constitution? The plaintiffs must prove that the system fails to provide South Dakota school children with an education that gives them the opportunity to prepare for their future roles as citizens, participants in the political system, and competitors both economically and intellectually. The plaintiffs focus on educational resources and academic results to prove their case.

Educational Resources

[¶ 38.] The plaintiffs concentrate on the conditions of their six focus school districts to support their contention of inadequate resources: Faith; Doland; Florence; Bon Homme; Willow Lake; and Rapid City.
[¶ 39.] Testimony as to conditions in these districts mainly came from their superintendents.[30] Common themes emerged: insufficient funding resources provided by the current school funding system; a resultant inability to meet ongoing funding obligations; and a lack of realistic options for increased funding. Due to low tax bases and rising costs for items such as insurance and fuel, the superintendents testified their districts were running out of funds and depleting their reserves. Some districts were surviving only with the benefit of successful opt outs while still others had been unable to pass opt outs and were facing future funding uncertainty. According to the superintendents, consolidation was not an option for most of their districts because of the distances involved and student travel times.
[¶ 40.] The superintendents testified that over time these declining economic conditions led to waves of budget cutbacks as well as numerous programming and staffing cuts. Advanced, college prep, gifted, foreign language, and arts programs were common casualties. Some of the districts cut technical and agriculture programs even in agriculture-based areas. Out of necessity, the districts were moving toward increased reliance on distance learning over DDN, an interactive educational video network. In the superintendents’ estimation, however, the DDN programs met with mixed results. Extracurricular programs also faced cutbacks, consolidation with neighboring districts, or elimination altogether. Cutbacks were also leading to more resource issues in some districts such as outdated textbooks and library books.
[¶ 41.] The negative impact of staffing cutbacks was another common theme among the superintendents. Because of staff cuts and understaffing, remaining teachers and administrators were forced to take on larger classes and increased workloads with less time for individual students. At the same time, they endured stagnant or frozen salaries. Some of the superintendents testified that the cutbacks caused morale issues and teacher burnout leading to resignations and increased turnover.
[¶ 42.] Teacher salaries were a consistent area of concern in these focus districts. The superintendents repeatedly testified that low or noncompetitive salaries caused an inability to recruit and retain qualified teachers. They perceived this as contributing to an overall decline in qualified applicants and to inexperienced teaching staffs.
[¶ 43.] Some of the superintendents testified to more unique challenges. Do- *635 land, Bon Homme, and Willow Lake maintained schools serving Hutterite Colonies. Those superintendents relayed their special hardships in providing adequate services to their economically disadvantaged and low English proficiency students.
[¶ 44.] Other focus districts faced special difficulties with deteriorating or inadequate facilities. Insufficient handicap access was one common point of testimony in this area while roof and basement leaks were another. Doland’s superintendent raised various safety issues, and Florence’s superintendent testified to a number of maintenance and space issues and a lack of air conditioning. Willow Lake’s superintendent provided similar testimony including complaints of rusty water pipes.
[¶ 45.] Faith’s superintendent testified to that district’s acute facility problems. Its 1919 school building was condemned in 2004. The district provided replacement quarters in the form of seven modular classrooms which continued to be utilized through the time of trial. The superintendent provided extensive testimony on the district’s financial inability to build a new school structure and as to the unique problems posed by the modular classrooms in terms of overcrowding, cleaning, maintenance, and safety as well as their responsibility for declining student morale.
[¶46.] The State relies on more positive evidence of conditions in the focus districts. The State points to the districts’ ability to maintain healthy general fund and capital outlay reserve balances despite their fiscal issues. The State also argues that opt outs were still available in some of the districts to increase funding. Moreover, some districts were not levying at the maximum limit for general funds or capital outlay funds, including some districts that had already passed opt outs. In addition, student populations were declining in a number of districts while property valuations were rising, adding some boost to local tax bases.
[¶ 47.] The State emphasizes the potential for consolidation as a means of addressing funding issues. Through cross-examination, the State established consolidation was a more feasible option for some districts than initially conceded by their superintendents. This was particularly true for those districts already engaged in a level of inter-district cooperation in areas such as technical education, athletics, and other extracurricular activities.
[¶ 48.] The State also points to evidence that some of the districts could have more advantageously used other available funding sources. For example, some districts were using general funds for state retirement fund contributions instead of pension funds. Use of pension funds would have left more general funds available in those districts for education purposes. Other districts were not maximizing use of their capital outlay funds. Increased capital outlay funds could have assisted not only in addressing some of the districts’ facility issues but also in purchasing equipment, computers, software, textbooks, and library books.
[¶ 49.] In terms of more significant facility issues, neither Faith nor Willow Lake had attempted bond issues while Florence had already had a successful bond election. The State also asserts some districts were maintaining more facilities than necessary. In this regard, the State argues that the districts are under no legal obligation to maintain separate Hutterite Colony schools, that Bon Hom-me does not need four separate attendance centers within its narrow geographic confines, and that Willow Lake need not maintain a community wellness center at district expense.
*636 [¶ 50.] Overall, the State disputes that conditions in the plaintiffs’ focus districts represent conditions in the state school districts as a whole. The State relies, in part, on testimony from Dr. Melmer. Dr. Melmer said he visited over a hundred school districts throughout the state and did not believe the facility problems in the focus districts were indicative of most school districts. He particularly described the trailer situation in Faith as unlike anywhere in the state and pointed out that the facilities in the focus districts varied. For example, he characterized Rapid City’s facilities as excellent. While acknowledging teacher shortages in key areas at the high school level, Dr. Melmer did not believe the overall situation was as severe as described in the focus district testimony. In terms of resources, Dr. Melmer testified he had not seen outdated textbooks in his visits and described classrooms as having good technology and updated materials. In Dr. Melmer’s opinion, the focus districts’ problems did not represent South Dakota school districts overall.
[¶ 51.] Relying upon Dr. Melmer’s testimony and its other experts, the State argues that many school districts have been able to provide a very solid and good environment for teaching and learning. The districts have provided adequate and in some cases, exemplary, facilities and resources, through modern technology, distance learning, and highly qualified teachers.[31]
[¶ 52.] The State highlights evidence that all of the 161 school districts met their state imposed accreditation and curriculum standards. School districts must be accredited (SDCL 13-13-18; ARSD 24:43:02:01); and to maintain accreditation they must meet a number of curriculum requirements (ARSD ch. 24:43:11). Schools in South Dakota meet or exceed the minimum state required curriculum and, at the time of trial, all of them offered the distinguished track curriculum consisting of ACT recommended core classes for college bound students. On a statewide basis, South Dakota schools also offer various career and technical education (CTE) courses such as agriculture and natural resources, business management and family and consumer science.

Academic Results

[¶ 53.] In terms of academic results, the plaintiffs cite National Assessment of Educational Progress (NAEP) and Dako-taSTEP test scores. Every state in the country administers NAEP tests in reading and math to their fourth and eighth grade students. The plaintiffs claim the NAEP test results show that less than half of our students are proficient in the categories tested.
[¶ 54.] The DakotaSTEP tests are part of South Dakota’s educational assessment and accountability system under NCLB.[32] The tests measure student *637 proficiency in reading and math according to standards approved by the United States Department of Education and the SDDOE. The tests are given annually to students in grades three through eight and eleven. The plaintiffs point out that Dako-taSTEP results indicate, on a statewide basis, approximately one out of every four students is not proficient in math. The plaintiffs particularly emphasize the lack of student proficiency in their six focus districts and three of the State’s focus districts.[33] The plaintiffs also cite evidence *638 that South Dakota school districts fail to meet adequate yearly progress goals as required by state law. The goals are designed to advance students who lack basic proficiency in math and reading. In particular, the plaintiffs emphasize the poor performance of Native American students. The 2008 state report card showed 52% of all Native American students in the state were not proficient in math and 38% were not proficient in reading.
[¶ 55.] The State argues that academic results need to be viewed on a statewide basis rather than just in the focus districts. A statewide view offers a more positive picture. The high statewide attendance and graduation rates compare well at a national level. The statewide DakotaS-TEP results for 2008 indicate that 84% of all children were proficient or advanced in reading while 76% were proficient or advanced in math. South Dakota students score above-average on ACT tests and a high percentage of high school graduates attend some form of post-secondary education. The State minimizes the poor results of the eleventh grade DakotaSTEP tests. Witnesses surmised that eleventh graders lacked incentive to excel on the tests because it did not impact their college eligibility or other post-high school opportunities. This pattern emerged in other states also.
[¶ 56.] Plaintiffs emphasize deficiencies in the funding system and questionable achievement results. The State emphasizes positive state-wide results. What level of achievement equates to a constitutional mandate is not clearly evident to this Court. The standards set by the SDDOE offer guidance, but are not alone determinative. Questions also loom concerning the disparity among districts and the educational opportunities they provide. Some districts are clearly struggling and, by their own estimation, offer less than a quality education. Although additional *639 funding could remove some of the inadequacies, other factors impact the results. Even assuming the deficiencies, the weakest link in the plaintiffs constitutional challenge is tying the funding to the results.

Correlation Between Funding and Results

[¶ 57.] Of the sixteen focus school districts the parties analyzed, Hamlin School District had the lowest per student expenditure in general funds in FY 2007 of $5,353. Yet, 87.5% of Hamlin’s students tested proficient or advanced in reading and 82.6% tested proficient or advanced in math. Assuming a correlation between funding and results, Hamlin should have been the poorest or one of the poorer performing focus districts in 2007. It was not. Moreover, Hamlin achieved these results while 42% of its students qualified for free or reduced lunches, a measure of the economically disadvantaged student population in the district.
[¶ 58.] Rapid City had the next lowest spending per student in FY 2007 at $5,432 per student. While its overall math scores in 2007 were poor with only 66.7% of the students testing as proficient or advanced, reading scores were competitive with 80.4% of the students testing in the proficient or advanced category. Among the Rapid City students, 31.5% qualified for free or reduced lunches.
[¶ 59.] The third lowest spending focus district in FY 2007 was the Miller School District at $5,598 per student. Again, assuming a correlation between funding and results, one would expect poor performance of Miller’s students. To the contrary, Miller’s scores were the highest of all of the focus districts with 84% of the students testing as proficient or advanced in math and 89.5% testing as proficient or advanced in reading. As for its economically disadvantaged population, 32.3% of the Miller students qualified for free or reduced lunches.
[¶ 60.] At the other end of the spectrum, the Shannon County School District had the highest spending of the focus districts in FY 2007 at $12,889 per student, over twice the per student spending of the Hamlin School District. Once again, assuming a correlation between funding and results, Shannon County should have been one of the better performing focus districts in 2007. That was not the case. Only 32.2% of its students tested proficient or advanced in math while only 53.5% of them tested proficient or advanced in reading— the worst results of any of the focus districts. Notably, 100% of the Shannon County students qualified for free or reduced lunches.
[¶ 61.] Like Shannon County, McLaughlin, the second highest spending focus district that year, posted test results among the worst, only 50% of the students tested proficient or advanced in math and 60% tested proficient or advanced in reading. McLaughlin School District spent $10,642 per student, nearly twice the per student spending of Hamlin School District. Also like Shannon County, 100% of the McLaughlin students qualified for free or reduced lunches.
[¶ 62.] At trial, Dr. Melmer provided additional examples of focus district performances where funding amounts did not correlate with student results. White River was the third highest spending focus district in 2007 at $9,716 per student. Yet, it had some of the poorest test results in line with Shannon County’s and McLaughlin’s. Dr. Melmer also indicated that Hamlin and Willow Lake were “side-by-side” districts, and that Hamlin spent “well below” Willow Lake while achieving test scores “at or above” Willow Lake’s. He identified a similar pattern between the neighboring Avon and Bon Homme School *640 Districts where spending in Avon was “quite a bit less,” yet achieved test scores similar to Bon Homme’s.
[¶ 63.] The State’s experts generally downplayed a results-funding correlation. The experts conducted statistical analyses of test scores and school district funding over several years in South Dakota. One expert found no correlation between a district’s total expenditures and its test scores, even after adjusting for socioeconomic circumstances affecting students such as poverty, English language learner status, race, and ethnicity. The expert concluded that, while socioeconomic circumstances had significant negative effects on achievement, school resources, including expenditures, had no significant effect. After analyzing the statistical information in a variety of ways, the expert concluded:
No matter how you look at the data, no matter what techniques you use, the data is very strong, it’s very consistent. Achievement patterns in South Dakota are being influenced heavily by students’ family background characteristics and school resources that we can measure, that we have measured, which includes most of the resource measures that experts have looked at throughout the country. Those resources do not by and large have significant effects. And the one that does have a significant effect is a very small effect compared to SES [ie. socioeconomic circumstances]. So very, very hard in South Dakota to change achievement by changing resource levels according to these studies.
He had found similar results in studies he had conducted in other states.
[¶ 64.] Another State expert concluded that, “across grades, across achievement areas, reading and math, across years, we don’t see any relationship between spending per pupil and achievement in South Dakota schools.” He claimed this observation mirrored results of thirty of the best national studies, which found that “attempts to improve achievement just by putting more resources into the schools and the classrooms have been ineffective ... [and] have not led to higher [student] achievement[.]”
[¶ 65.] As additional support for their conclusions, these experts referred to New Jersey and Wyoming experiences where student expenditures were significantly increased over time without measurable improvements in student achievement. One of the experts also referred to national spending having tripled between 1970 and 2000 while student performance remained level.
[¶ 66.] Several of the witnesses agreed that poor student achievement is impacted by factors other than funding, such as parental issues, environmental issues, attendance issues, instructional programs, and internal resource allocation. Of particular concern was how to improve the performance of economically disadvantaged students. Although additional funding for pre-kindergarten programs may be one way of addressing the problem — as one expert advocated — most of the experts agreed that the achievement gap for economically disadvantaged students exists in every state in the nation. A complex set of socioeconomic factors and experiences contributes to the achievement gap, and no other state has been able to eliminate the gap, including those spending nearly twice the average per pupil amount that South Dakota spends.
[¶ 67.] The testimony and evidence raises questions about the correlation between the level of funding and student achievement. On this record, the correlation between the school funding system and poor academic results is not readily apparent. Contrast this with the evidence before the New York Court of Appeals in *641 Campaign for Fiscal Equity, Inc. v. State of New York, where the court found funding for the New York City schools did not meet constitutional requirements, but emphasized the “unique combination of circumstances” that permitted the plaintiff/appellants to prevail:
New York City schools have the most student need in the state and the highest local costs yet receive some of the lowest per-student funding and have some of the loorst results. Plaintiffs in other districts who cannot demonstrate a similar combination may find tougher going in the courts.
100 N.Y.2d 893, 769 N.Y.S.2d 106, 801 N.E.2d 326, 350 (2003) (emphasis original).
CONCLUSION
[¶ 68.] We hold that the South Dakota Constitution guarantees all South Dakota children a free, adequate, and quality public education which provides them with the opportunity to prepare for their future roles as citizens, participants in the political system, and competitors both economically and intellectually. Here, because the plaintiffs are challenging the constitutionality of the state education funding system, they have a high burden to meet. They have to overcome the presumption of constitutionality. They have to show that the state funding system is “clearly and unmistakably” unconstitutional and “there is no reasonable doubt that it violates fundamental constitutional principles.” South Dakota Ass’n, 280 N.W.2d at 664-65. They have to show that the Legislature’s system of funding fails to provide children of the state with an adequate and quality education, that is, it fails to give them the opportunity to adequately prepare for their future roles as citizens, participants in the political system, and competitors both economically and intellectually. The plaintiffs’ evidence raises serious questions about whether the state aid formula is based on actual costs and whether local taxing procedures and caps might have constitutional implications. The plaintiffs have also shown some groups of students are not achieving at desired levels and that some districts struggle to provide adequate facilities and qualified teachers. Even so, reasonable doubt exists that the statutory funding mechanisms or level of funding are unconstitutional. We are unable to conclude that the education funding system (as it existed at the time of trial) fails to correlate to actual costs or with adequate student achievement to the point of declaring the system unconstitutional. We affirm the trial court.[34]
*642 [¶ 69.] KONENKAMP, ZINTER, and SEVERSON, Justices, concur.
[¶ 70.] GILBERTSON, Chief Justice, concurs in result.
[¶ 71.] WILBUR, Justice, not having been a member of the Court at the time this action was submitted to the Court, did not participate.

. Oscar William Coursey, A Complete Biographical Sketch of General William Henry Harrison Beadle 87-91 (1913).

. Defendants are the State of South Dakota, the South Dakota Department of Education (SDDOE) (a subdivision of South Dakota state government), the South Dakota Board of Education, and three state officials in their official capacities: The Governor, M. Michael Rounds; the State Treasurer, Vernon L. Larson; and the South Dakota Secretary of Education, Dr. Rick Melmer. Either since the trial of this matter or the appeal to this Court, the state officials named as defendants have been replaced in office by election or, in Dr. Melmer’s case, through resignation and a subsequent appointment. The proceedings are as follows:
In June 2006, the plaintiffs filed a complaint against the defendants in circuit court for the Sixth Judicial Circuit in Hughes County, South Dakota. The complaint asked the court to: a) declare that the public school finance system violates the education clauses of the state constitution; b) prohibit the defendants from "administering, enforcing, and/or funding” the public school finance system; c) maintain judicial oversight over the legislative and executive branches of state government to correct "constitutional inadequacies.”
In March 2007, the defendants filed a motion to dismiss for lack of subject matter jurisdiction on the ground that the plaintiffs’ claims were not justiciable. The plaintiffs filed a motion for partial summary judgment asking the court to declare that education is a fundamental right under the South Dakota Constitution and that Article VIII of the South Dakota Constitution guarantees all South Dakota children a free, adequate and quality *624 public education. The plaintiffs also asked the court to declare standards for an adequate and quality education under the South Dakota Constitution.
After a hearing, the trial court denied the defendants’ motion to dismiss for lack of subject matter jurisdiction. The trial court did, however, dismiss the plaintiffs’ claims for any remedy beyond declaratory relief under the Declaratory Judgments Act. See SDCL ch. 21-24. The court also denied the plaintiffs’ motion for partial summary judgment but declared: "Article VIII of the South Dakota Constitution guarantees as a constitutional right that all South Dakota children are entitled to a free and adequate public education[.]”
The case was tried from September 2 through September 30, 2008. On June 10, 2009, the trial court entered findings of fact, conclusions of law and a judgment in favor of the defendants and against the plaintiffs on all claims. Plaintiffs appeal.

. See, e.g., Campbell Cnty. Sch. Dist. v. State (Campbell Cnty. I), 907 P.2d 1238, 1258 (Wyo.1995) (quoting The Century Dictionaiy (1889) in defining "uniform,” “system,” "thorough,” and "efficient”).

. C.A. Beaver, Financial Support for Education in South Dakota from the Beginning of Territorial Days, in 18 South Dakota Historical Collections, Studies in South Dakota Education 35 (R.W. Kraushaar ed., Smith & Co.1936).

. William Maxwell Blackburn, Historical Sketch of North and South Dakota 1893, reprinted in 1 South Dakota Historical Collections 78 (News Printing Co.1902).

. Memoirs of General William Henry Harrison Beadle with Editorial Notes by Doane Robinson, reprinted in 3 South Dakota Historical Collections 151 (1906).

. Cleata B. Thorpe, Education in South Dakota, Its First Hundred Years, 1861-1961 (1968), reprinted in 36 South Dakota Historical Collections 205, 213 (1972).

. Thorpe, supra note 7, at 232. See also 1879 Dakota Laws ch. 14, § 4.

. See 1879 Dakota Laws ch. 14, § 4.

. Memoirs of General Beadle, supra note 6, at 178.

. W.H.H. Beadle, Dakota Schools (1882), reprinted in 3 South Dakota Historical Collections 247, 260 (1906).

. Everett W. Sterling, The Bumpy Road to Statehood, in Dakota Panorama 363, 364 (J. Leonard Jennewein & Jane Boorman eds., Brevet Press 3rd prtg.1973).

. Id.

. Id. at 364-65.

. See Introductory, in 1 Dakota Constitutional Convention 5-7 (Doane Robinson ed., Hu-ronite Prtg. Co. 1907).

. Id. at 29.

. Id. at 30.

. Id.

. See also George Harrison Durand, loseph Ward of Dakota 169-70 (Pilgrim Press 1913); Herbert S. Schell, History of South Dakota 221-22 (S.D. State Hist. Soc. Press 4th ed., rev.2004); 2 South Dakota Constitutional Convention 250-60 (Doane Robinson ed., Hu-ronite Prtg. Co.1907).

. Schell, supra note 19, at 222.

. See Connecticut Coalition for Justice in Educ. Funding, Inc. v. Rell, 295 Conn. 240, 990 A.2d 206, 253 (2010) (interpreting the Connecticut Constitution to require an education "suitable to give [students] the opportunity to be responsible citizens” and “to progress to institutions of higher education, or to attain productive employment[.]”); Skeen v. State, 505 N.W.2d 299, 310 (Minn.1993) (interpreting the Minnesota Constitution to require an education enabling students to " 'discharge intelligently their duties as citizens’ ” and " 'to prepare them for useful and happy occupations[.]' ") (quoting Bd. of Educ. of Sauk Centre v. Moore, 17 Minn. 412, 416 (1871); Pauley v. Kelly, 162 W.Va. 672, 255 S.E.2d 859, 877 (1979)); Hoke Cnty. Bd. of Educ. v. State, 358 N.C. 605, 599 S.E.2d 365, 380 (2004) (interpreting the North Carolina Constitution as requiring preparation of students " 'to participate and compete in the society in which they live and work[.]'") (quoting Leandro v. State, 346 N.C. 336, 488 S.E.2d 249, 254 (1997)).

. This does not mean that the plaintiffs have the burden of proving each fact beyond a reasonable doubt, as the State argues. We find no merit in this argument because it confuses the distinction between burden of production and burden of persuasion. We attempted to clarify the difference in Gordon v. St. Mary’s Healthcare Center:
For many years the term 'burden of proof was ambiguous because the term was used to describe two distinct concepts. Burden of proof was frequently used to refer to what we now call the burden of persuasion-the notion that if the evidence is evenly balanced, the party that bears the burden of persuasion must lose. But it was also used to refer to what we now call the burden of production-a party’s obligation to come forward with evidence to support its claim.
Director, Office of Workers’ Compensation Programs v. Greenwich Collieries, 512 U.S. 267, 272, 114 S.Cl. 2251, 2255, 129 L.Ed.2d 221, 228 (1994). " 'It is generally said that the burden of production may pass from party to party as the case progresses while the burden of persuasion rests throughout on the party asserting the affirmative of an issue.' ” Hayes v. Luckey, 33 F.Supp.2d 987, 990 (N.D.Ala.1997) (citation omitted).
2000 S.D. 130, ¶ 24, 617 N.W.2d 151, 157-58.
If facts are in dispute, the trial court (as the fact-finder) resolves the differences and makes a finding as to those disputed facts based on the evidence produced. The trial court's findings are reviewed under a clearly erroneous standard. State v. Dillon, 2010 S.D. 72, ¶ 49, 788 N.W.2d 360, 373.

. School districts segregate their revenues into a number of separate fund accounts including the general fund, the capital outlay fund, the special education fund, and the pension fund. SDCL 13-16-2, 13-10-6. The general fund is used for all of the operational costs of a school district, excluding capital outlay and special education fund expenditures. SDCL 13-16-3. Thus, the general fund is the source from which almost all of the school district’s funding requirements must be met. Local revenue generally accounts for approximately half the revenue in a school district’s general fund. The remainder comes from state aid.

. The small school adjustment replaced the former "small school factor” in 2007. The small school factor was similarly designed to provide additional assistance to smaller school districts.

. See 1996 S.D. Sess. Laws ch. 69, § 5; 1997 S.D. Sess. Laws ch. 53, § 1; 1998 S.D. Sess. Laws ch. 59, § 1; 1999 S.D. Sess. Laws ch. 49, § 1; 2000 S.D. Sess. Laws ch. 50, § 1; 2001 S.D. Sess. Laws ch. 51, § 1; 2002 S.D. Sess. Laws ch. 52, § 1; 2003 S.D. Sess. Laws ch. 52, § 1; 2004 S.D. Sess. Laws ch. 83, § 1; 2005 S.D. Sess. Laws ch. 60, § 1; 2006 S.D. Sess. Laws ch. 41, § 1; 2007 S.D. Sess. Laws ch. 48, § 1.

. Periodically, the Legislature has appropriated per student funds outside of the state aid formula and funding for special programs such as consolidation incentives, heating assistance, career and technical education grants, and teacher compensation assistance. Further, the state has provided technological assistance to the school districts including: internet service and net management; provision of a student information management system (SIMS) accessible to parents online; and maintenance and support of the Dakota Digital video Network (DDN) used for distance learning. The state has also provided funding assistance for: GEAR UP programs to assist economically disadvantaged students; laptop computers and training for teachers and technology coordinators; formative assessment tools; regional agencies providing technical assistance to schools under the federal No Child Left Behind Act (NCLB); online testing for student diagnostic purposes; online curriculum assistance; online advanced placement courses and exam review; and online access to DakotaSTEP test results measuring proficiency for NCLB purposes.

. The Wyoming court also required a thorough review of all of the components of the funding system every five years to ensure funding accurately reflected actual costs school districts were paying because of market or economic conditions. See Campbell Cnty. II, 19 P.3d at 549.

. The State contends that, despite the loss of this inflationary increase, the overall package *633 of legislative changes to the school funding formula in 2007 actually benefitted smaller schools. However, the testimony was equivocal on this point, the defense expert conceding, "It's — the formula is so complex. Again, it would depend on whether they had a decline in student numbers. It’s not just the dollars in the formula. There's other pieces of it too.” We agree. The formula is complex. As noted by the Wyoming Supreme Court in regard to that state's school funding formula in Campbell County /, " '[i]f lack of clarity alone were sufficient to strike these statutes down, this case would be less difficult.’ " 907 P.2d at 1248 (quoting Roosevelt Elem. School Dist. v. Bishop, 179 Ariz. 233, 877 P.2d 806, 809-10 (1994)).

. During discovery, the parties entered into an agreement regarding the selection of "focus districts” for analyzing the education system. The focus district agreement was not required by the trial court. The plaintiffs initially selected eleven and the State ten focus districts. Prior to trial, the plaintiffs dropped five of their focus districts and the trial court ruled any evidence on those dis-, tricts offered by the State was irrelevant. Thus, at trial, the plaintiffs offered evidence as to their six remaining focus districts: Faith; Florence; Doland; Bon Homme; Willow Lake; and Rapid City. The State offered evidence as to their ten focus districts: Sanborn Central; Miller; Avon; Faulkton; Hamlin; Sisseton; White River; McLaughlin; Shannon County; and Flandreau.

. Testimony in this area concerning the Rapid City Area School District was provided by a former school board member rather than the district's superintendent. Nevertheless, his testimony echoed that of the superintendents' and is incorporated in this discussion.

. In terms of teaching resources, the data reflects that: only 1.6% of all core content areas are not being taught by highly qualified teachers as ranked for NCLB purposes (down by 9.7% since 2003); every teacher in South Dakota has a bachelor's degree and a growing percentage have master’s degrees; South Dakota teachers possess an average of fifteen years of experience and only 12% at the time of trial had less than three years of experience.

. The plaintiffs assert meeting state imposed academic standards and achievement requirements such as those under NCLB is part of the standard for an adequate, basic quality education under the South Dakota Constitution. However, the Legislature may impose education standards beyond those required by the constitution. See Breck v. Janklow, 2001 S.D. 28, ¶ 9, 623 N.W.2d 449, 454 (stating the legislative power is unlimited except as it is limited by the state and federal constitution) (citing Wyatt v. Kundert, 375 N.W.2d 186, *637 190-91 (S.D.1985)). Further, ‘'[t]he legislature cannot define the scope of a constitutional provision by subsequent legislation.” Poppen v. Walker, 520 N.W.2d 238, 242 (S.D.1994). Nevertheless, education standards have clearly advanced since the writing of the constitution. As early as 1931, this Court recognized: "What would have been considered a good average education in 1881 would not be so considered today. Standards of education have advanced, and methods of teaching have changed.” State ex, rel. Prchal v. Dailey, 57 S.D. 554, 234 N.W. 45, 47 (1931). Because the Legislature is " ‘uniquely equipped’ ” to evaluate and respond to such issues of public policy and to make choices as to what is involved in providing a basic education, compliance with state imposed academic standards and achievement requirements is relevant as one measure of compliance with the constitution. See Vincent v. Voight, 236 Wis.2d 588, 614 N.W.2d 388, 407 (2000) (quoting Kukor, 436 N.W.2d at 583 n. 14).

. The results are summarized as follows: Rapid City School District
2008 Results
Percentage of all students not proficient in math. 33.3%
Nat. Am. 11th graders not proficient in math. 69%
Nat. Am. 1 lth graders not proficient in reading. 63%

Faith School District

2007 Results
1 lth graders not proficient in math. 50%
1 lth graders not proficient in reading .... 44%
2008 Results
11th graders not proficient in math. 40%
11th graders not proficient in reading .... 45%

Doland School District

2007 Results
1 lth graders not proficient in math. 67%
1 lth graders not proficient in reading .... 39%
2008 Results
1 lth graders not proficient in math. 66%
1 lth graders not proficient in reading .... 50%

Florence School District

2007 Results
1 lth graders not proficient in math. 62%
1 lth graders not proficient in reading .... 71%
2008 Results
1 lth graders not proficient in math. 25%
1 lth graders not proficient in reading .... 25%

Bon Homme School District

2007 Results
1 lth graders not proficient in math. 25%
1 lth graders not proficient in reading .... 38%
2008 Results
1 lth graders not proficient in math. 37%
1 lth graders not proficient in reading .... 41%

Willow Lake School District

2008 Results
5th graders not proficient in math. 54%
5th graders not proficient in reading. 38%
1 lth graders not proficient in math. 33%
*638 1 lth graders not proficient in reading .... 40%

White River School District

2007 Results
Percentage of all students not proficient in math. 56%
Nat. Am. Students not proficient in math 62%
1 lth graders not proficient in math. 89%
1 lth graders not proficient in reading .... 62%
Nat. Am. 1 lth graders not proficient in math. 93%
Nat. Am. 1 lth graders not proficient in reading . 71%
2008 Results
Percentage of all students not proficient in math. 56%
Nat. Am. Students not proficient in math 65%
Nat. Am. 1 lth graders not proficient in math. 71%
Nat. Am. 11th graders not proficient in reading . 64%

McLaughlin School District

2007 Results
Percentage of all students not proficient in math. 49%
1 lth graders not proficient in math. 74%
1 lth graders not proficient in reading .... 74%
2008 Results
Percentage of all students not proficient in math. 50%
1 lth graders not proficient in math. 70%
1 lth graders not proficient in reading .... 65%

Shannon County School District

2007 Results
Percentage of all students not proficient in math. 68%
Nat. Am. Students not proficient in math 68%
2008 Results
Percentage of all students not proficient in math. 70%'
Nat. Am. Students not proficient in math 71%

. Relying on federal justiciability analysis, the State argues this Court should not address the merits of the constitutional issue in this case on the basis that it poses a non-justicia-ble political question. See Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). We reject this argument. The Connecticut Supreme Court recently cited decisions from nine states in observing that “the vast majority of jurisdictions 'overwhelmingly' have concluded that claims that their legislatures have not fulfilled their constitutional responsibilities under their education clauses are justicia-ble.” Conn. Coal. for Justice in Educ. Funding, 990 A.2d at 225 n. 24 (citing decisions from Kentucky, Massachusetts, Idaho, Colorado, Indiana, Montana, North Carolina, Ohio, and Texas). See also State v. Campbell Cnty. Sch. Dist. (Campbell County III), 32 P.3d 325, 333-37 (Wyo.2001) (rejecting the position that school finance issues are nonjusticiable political questions). The Colorado Supreme Court held school funding claims to be justiciable in Lobato v. State, 218 P.3d 358 (Colo.2009). Part of its rationale was that "it is the province and duty of the judiciary to interpret the [state constitution] and say what the law is.” Id. at 372. The court declined to follow federal justiciability analysis because of the broader jurisdiction bestowed on state courts versus the limited jurisdiction of federal courts. Id. at 370. This Court has previously asserted the same prerogative of constitutional interpretation as the Colorado court and *642 we do so here. See Brendtro, 2006 S.D. 71, ¶ 19, 720 N.W.2d at 676 n. 3 (stating this Court is charged with the ultimate interpretation of the South Dakota Constitution).